1  John T. Jasnoch (CA 281605)
   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
2  600 W. Broadway, Suite 3300
   San Diego, CA 92101
3  Telephone: (619) 233-4565
   Facsimile: (619) 233-0508
4  jjasnoch@scott-scott.com

5  *Counsel for Plaintiff and the proposed class*

6  [Additional Counsel on Signature Page.]

7

8                  **UNITED STATES DISTRICT COURT**
                 **NORTHERN DISTRICT OF CALIFORNIA**
9                      **SAN JOSE DIVISION**

10  JULIANNE LOUIE                          | Civil Action No. 5:26-cv-01024

11                    Plaintiff,             | **CLASS ACTION COMPLAINT FOR**
                                             | **VIOLATIONS OF THE FEDERAL**
12         v.                                | **SECURITIES LAWS**

13  PICARD MEDICAL, INC.; PATRICK NJ
    SCHNEGELSBERG; BERNARD SKAGGS;
14  MATT SCHUSTER; YUNCAI "RICHARD"
    FANG; CHRIS HSIEH; WESTPARK
15  CAPITAL, INC.; SENTINEL BROKERS
    COMPANY, INC.; R.F. LAFFERTY & CO.
16  INC.; AMERICAN TRUST INVESTMENTS;
    MALONEBAILEY, LLP
17
                      Defendants.
18

19

20

21

22

23

24

25

26

27

28

Plaintiff Julianne Louie ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Picard Medical, Inc. ("Picard" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Picard; and (c) review of other publicly available information concerning Picard.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Picard securities between September 2, 2025, and October 31, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against Picard Medical Inc., Patrick NJ Schnegelsberg, Matt Schuster, Yuncai "Richard" Fang, Chris Hsieh, Westpark Capital, Inc., Sentinel Brokers Company, Inc., R.F. Lafferty & Co. Inc., American Trust Investments, and MaloneBailey, LLP (the "Defendants") under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      The Company claims to engage in designing, manufacturing, production, supply, marketing, and sale of medical device products. Their website details their most significant product is an artificial heart called "SynCardia TAH." The company is headquartered in Tucson, Arizona, with operations in the United States, Europe, and China.

3.      The Company is a controlled (55% owned) subsidiary of Hunniwell Picard I, LLC ("Hunniwell") headed by Yuncai ("Richard") Fang, Sinyew ("Daniel") Teo, and Chris Hsieh. Hunniwell is part of the venture capital firm Hunniwell Lake Ventures, LLC headquartered at 4 Palo Alto Square, Suite 200, 3000 El Camino Real, Palo Alto, CA 94306, USA and is also managed by Yuncai ("Richard") Fang and Sinyew ("Daniel") Teo.

4.      The Company has been in its current form since acquiring a controlling stake in SynCardia Systems, LLC in 2021, and is incorporated in the state of Delaware. Its principal place of business is located at 1992 E Silverlake, Tucson, AZ 85713, USA.

5.      During 2023 and 2024 Picard attempted to go public through a reverse merger by acquiring Altitude Acquisition Corp, ("Altitude") a publicly traded company at the time.[1] However, the takeover was unsuccessful with the parties unable to satisfy both regulators and existing shareholders.  Ultimately, Altitude repurchased all of its outstanding shares, effectively delisting itself in March 2024.[2]  Undeterred, Picard pivoted to taking the Company public on its own merits.  On September 2, 2025, Picard succeeded; getting the Company's initial public offering ("IPO") approved by the SEC and stock listed on Nasdaq under the symbol "PMI."[3]

6.      This case arises from the sudden collapse of Picard's stock in late October 2025, following a dramatic yet illusory run-up orchestrated by a fraudulent stock promotion scheme.

7.      Throughout the proposed class period to the present, regulators have identified a recurring pattern in problematic micro-cap IPOs: very small public floats, sharp price increases without corresponding news, and trading activity driven by coordinated promotion in online groups.  Such low-float offerings can be structured in ways that allow a limited number of accounts, often including offshore brokers, to influence market prices.  Picard's IPO shared all these characteristics.  With only about 5% of its shares available to the public and limited transparency regarding initial share allocations, the Company's structure created conditions which made the stock particularly vulnerable to manipulation.  In the weeks leading up to October 23, 2025, Picard's share price surged from the initial public offering ("IPO") price of $4.00 to an all-time high of $13.68 per share, despite no fundamental news from the Company to justify such a spike.

---

[1]      Press Release, Altitude Acquisition Corp., Picard Medical and its Subsidiary, SynCardia Systems, a Pioneer in Total Artificial Heart Technology, to Become a Publicly Traded Company via Merger with Altitude Acquisition Corp. (Apr. 24, 2023) (on file with author), https://www.altitudeac.com/press-releases/detail/48/picard-medical-and-its-subsidiary-syncardia-systems-a.

[2]      Press Release, Altitude Acquisition Corp. Altitude Acquistion Corp. Announces Liquidation of Trust Account (Mar. 12, 2024) (on file with author), https://www.altitudeac.com/press-releases/detail/59/altitude-acquisition-corp-announces-liquidation-of-trust.

[3]      Picard Medical, Inc., Prospectus (Form 4242B4) (Aug. 29, 2025), https://www.sec.gov/Archives/edgar/data/2030617/000182912625006957/picardmedical_424b4.htm.

8.      Investigations and public reports have since revealed that Picard's stock became the subject of an illicit social-media-based promotion scheme that artificially inflated its price. These reports detail how impersonators claiming to be legitimate financial advisors touted Picard in online forums, chat groups, and through social media posts with sensational but baseless claims to create a buying frenzy among retail investors.

9.      This sharp rise proved short-lived.  On October 24, 2025, Picard's stock price abruptly crashed 70%, to $3.99 per share.  Since then, the Company's share price has continued to decline to approximately $2.00 per share.

10.     The structure of Picard's IPO mirrored that of several other recent Nasdaq-listed micro-cap companies implicated in pump-and-dump manipulation such as Ostin Technology Group Co., Ltd. ("OST"), Jayud Global Logistics Limited ("JYD"), and China Liberal Education Holdings Ltd ("CLEU") to name just a few.  These offerings were characterized by unusually low floats (often under 10%), overwhelming insider control via super-voting shares or offshore affiliates, and minimal public disclosures.  In each instance, thinly traded shares were aggressively promoted via impersonator-run WhatsApp or WeChat groups and social media "stock tip" campaigns using the stolen identities of U.S. financial advisors.  The Picard IPO shared all of these structural hallmarks, yet neither the Registration Statement, Prospectus (collectively "the Offering Documents") nor press releases made any mention of the substantial market manipulation risk inherent to such offering architecture.

11.     Despite these structural vulnerabilities, Picard's Offering Documents included no disclosure that the Company's unusually small float and concentrated insider control created an elevated risk of artificial price inflation through coordinated social-media promotions.  By September 2025, multiple low-float Nasdaq IPOs with similar ownership structures—including OST, JYD and CLEU—had already been targeted by WhatsApp and WeChat impersonator schemes, leading to extreme volatility, trading halts, and regulatory scrutiny.  These risks were neither theoretical nor remote and were well known to Defendants.  Yet Defendants did not warn investors that its securities were especially susceptible to the same type of promotion-based manipulation.

CLASS ACTION COMPLAINT

12.     Defendants also failed to update investors as warning signs emerged during the Class Period.  Before the October 23 collapse, unusual trading activity, outsized price swings, and the circulation of false claims in online investor groups were already public and readily observable.  At no point did Picard issue a cautionary statement alerting investors to these developments or warning that the stock's movement did not reflect Company fundamentals.  Instead, Defendants continued to tout the Company's prospects while omitting that the trading environment surrounding PMI had become highly irregular.

13.     Furthermore, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and the true nature of its securities trading activity throughout the class period.  Specifically, Defendants failed to disclose to investors: (1) that Picard was the subject of a fraudulent stock promotion scheme involving social media-based misinformation and impersonated financial professionals; (2) that insiders and/or affiliates used offshore or nominee accounts to facilitate the coordinated dumping of shares during a price inflation campaign; (3) that Picard's public statements and risk disclosures omitted any mention of the false rumors and artificial trading activity driving the stock price; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**JURISDICTION AND VENUE**

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information,

CLASS ACTION COMPLAINT

1  occurred in substantial part in this Judicial District.  In addition, Hunniwell Lake Ventures, LLC,

2  the Company's parent, is headquartered in this District.

3      17.     In connection with the acts, transactions, and conduct alleged herein,

4  Defendants directly and indirectly used the means and instrumentalities of interstate commerce,

5  including the U.S. mail, interstate telephone communications, and the facilities of a national

6  securities exchange.

7                              **PARTIES**

8      18.     Plaintiff Julianne Louie, as set forth in the accompanying certification,

9  incorporated by reference herein, purchased Picard securities during the Class Period, and

10  suffered damages as a result of the federal securities law violations and false and/or misleading

11  statements and/or material omissions alleged herein.

12      19.     Defendant Picard is a Delaware corporation with its principal headquarters located

13  in Tucson, Arizona.  Picard is majority owned and controlled by Hunniwell Lake Ventures, LLC

14  whose principal executive offices are located in Palo Alto, California.  The company's common

15  stock trades on the NASDAQ exchange under the symbol "PMI."

16      20.     Defendant Partick NJ Schnegelsberg ("Schnegelsberg") was the Company's Chief

17  Executive Officer ("CEO") at all relevant times.

18      21.     Defendant Bernard Skaggs ("Skaggs") was the Company's Chief Financial Officer

19  ("CFO") at all relevant times.

20      22.     Defendant Yuncai "Richard" Fang ("Fang") was a Director of the Company and

21  Managing Director of Hunniwell Lake Ventures, LLC at all relevant times.

22      23.     Defendant Chris Hsieh ("Hsieh") was a Director of the Company and Managing

23  Director of Hunniwell Lake Ventures, LLC at all relevant times.

24      24.     Defendant WestPark Capital, Inc. ("WestPark") was the Company's principal

25  underwriter for the September 2, 2025, IPO.

26      25.     Defendant Sentinel Brokers Company, Inc. ("Sentinel") was an underwriter for

27  the Company's September 2, 2025, IPO.

28

CLASS ACTION COMPLAINT

26.    Defendant R.F. Lafferty & Co., Inc. ("Lafferty") was an underwriter for the Company's September 2, 2025, IPO.

27.    Defendant American Trust Investment Services ("American Trust") was an underwriter for the Company's September 2, 2025, IPO.

28.    Defendant MaloneBailey, LLP ("MaloneBailey") was the company's auditor at all relevant times.

29.    Defendants Schnegelsberg, Skaggs, Fang, and Hsieh (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors (i.e., the market). The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

30.    Defendant MaloneBailey (the "Auditor Defendant") issued clean audit opinions on financial statements incorporated into the September 2, 2025, IPO.   Additionally, MaloneBailey was Picard's auditor at the time of the IPO and had access to material non-public information during the class period.  Because of their position, MaloneBailey knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and/or misleading.  Furthermore, due to their position, the Auditor Defendant had the ability and opportunity to prevent issuance of the fraudulent SEC filings or cause them to be corrected. Therefore, they are also liable for the false statements pleaded herein.

31.    Defendants Westpark, Sentinel, Lafferty, and American Trust (the "Underwriter Defendants") were the "underwriters" as defined by 15 USC § 80a-2(a)(40) of the Exchange Act

1    for issuance of Picard securities by way of the IPO consisting of the registration statement Picard

2    filed on August 6, 2025, ("Registration Statement") and prospectus supplement filed on

3    September 2, 2025 ("Prospectus") containing the materially false and misleading statements

4    detailed in this complaint.  Due to their position, the Underwriter Defendants had the ability and

5    opportunity to prevent issuance of the fraudulent Registration Statement and Prospectus, and/or

6    cause them to be corrected.  Therefore, they are also liable for the false statements pled herein.

7         32.    WestPark Capital, the IPO's lead bookrunner, had a well-known history of taking

8    small, high-risk issuers public, including several micro-cap offerings that later encountered

9    regulatory scrutiny or trading halts.  WestPark has long been associated with low-float offerings

10   that proved vulnerable to manipulation.  Despite this background, WestPark and the other

11   Underwriter Defendants proceeded with Picard's unusually small-float IPO, a structure which

12   amplified volatility and made the stock susceptible to coordinated trading activity.  Defendants'

13   decision to endorse the IPO under these circumstances supports an inference that they either

14   knowingly recognized or recklessly disregarded the clear risks that Picard's shares would be used

15   in a promotional scheme.

16                    **SUBSTANTIVE ALLEGATIONS**
                    **Materially False and Misleading**
17              **Statements Issued During the Class Period**

18        33.    The Class Period begins on September 2, 2025, when the Company filed an IPO

19   prospectus permitting Picard to issue 4,250,000 shares of their common stock at an initial offering

20   price of $4.00/share for a total capital raise of $17.0M.[4]  Total outstanding shares after the IPO

21   were disclosed to be 72,324,145 common and 18,406,857 preferred.  Therefore, the IPO

22   represented just ~5% of total Picard ownership.  In the IPO, to describe their business, the

23   Company stated:

24        *We are a holding company that owns 100% of the membership interests of*
          *SynCardia Systems, LLC ("SynCardia").  Our business is carried out by*
25        *SynCardia, and thus most of the information set forth in this prospectus relates to*
          *the business of SynCardia.*
26

27   _____

28   [4]      *Id.*

                                        7

*SynCardia is a medical technology company that manufactures and sells the only U.S. Food and Drug Administration ("FDA"), and Health Canada approved implantable total artificial heart (the "SynCardia TAH"). To date, over 2,100 SynCardia TAHs have been implanted in patients in 27 countries and the SynCardia TAH is an established bridge to heart transplantation for patients with biventricular failure in the U.S., and around the world.*

*Our future vision is to develop the world's first fully implantable SynCardia TAH as an alternative to heart transplantation for patients with biventricular heart failure in the U.S. and around the world. For near term new product developments, we are committed to innovating our current driver technology, to expand the current indication for use of the SynCardia TAH from Bridge to Transplantation ("BTT"), to Bridge to Candidacy ("BTC"), and for long-term use of two years or more. BTT products are intended to support patients with end-stage heart failure who are already listed or deemed eligible for a heart transplant. The BTT indication includes patients who are transplant candidates but need mechanical circulatory support ("MCS") due to declining health or to stabilize them while waiting for donor heart. BTC products support patients while determining their eligibility for transplantation. This is typically for patients who need more time for medical optimization, evaluation, or stabilization before a final determination of transplant candidacy. The duration of support typically is longer than BTT if patients need extensive rehabilitation or additional workup to resolve contraindications to becoming transplant eligible. The BTC indication includes patients who are not immediately transplant-eligible due to reversible contraindications (e.g., organ dysfunction, infection, or need for psychosocial assessment) but may become transplant eligible after receiving MCS. The Long-term use indication includes patients who are ineligible for a heart transplant and need long-term heart replacements for 2 years or more. Finally, we plan to expand our product sales into more international markets.*

*The currently available, FDA and Health Canada-approved, SynCardia TAH System consists of an implant (including left and right artificial ventricles), external pneumatic drivers to power the implant, and drivelines that connect the driver to the implant. The implantation procedure follows routine surgical techniques used by cardiothoracic surgeons performing heart transplants. The drivers powering the SynCardia TAH are available for in-hospital use (Companion 2) and or in-hospital and in-home use ("Freedom Driver") and generate true pulsatile flow using a redundant pneumatic pump assembly. The core of our approved technology is our heart ventricles with blood contacting surfaces that already have over 2,100 implants' worth of clinical experience. We intend to augment our heart ventricles to include an internal driver system to achieve a fully implantable TAH system that does not require use of an external pneumatic driver as our current product does. Our next generation, the fully implantable Emperor Total Artificial Heart ("Emperor") is expected to be designed to provide pulsatile flow without requiring external pneumatic drivers. Emperor design prototypes are currently undergoing non-clinical bench testing. We plan to conduct acute animal studies using selected Emperor design prototypes during the first half of 2025. Depending on the outcomes of these and other non-clinical testing, we may be able to seek FDA approval for Emperor in 2028.*

*The SynCardia TAH remains the only approved total artificial heart in the United States and Canada for the BTT indication. Carmat SA, a French company, recently obtained the CE mark for its Aeson TAH device in Europe. Beyond the SynCardia TAH and the Aeson device, there are no other artificial hearts approved for commercial use in any market. BiVACOR, Inc. began early-stage*

*human clinical testing in July 2024 for its BiVACOR total artificial heart. While, to date, there are no head-to-head trials to compare total artificial hearts to each other, we believe that based on our technology, intellectual property, know-how, and extensive human clinical experience, we have significant advantages over other companies developing other TAH products.*

34.    The IPO also contained the following 2023, 2024, and 2025 financial results:

**<u>Results of Operations</u>**

**Comparison of Year Ended December 31, 2024 and 2023**

*<u>Revenues</u>*

*Total revenues decreased by $0.7 million or 13% for the year ended December 31, 2024, as compared to the year ended December 31, 2023. This decrease is due to a decline in U.S. sales of $0.4 million and foreign sales of $0.3 million. Furthermore, in year ended December 31, 2023, we terminated our U.S. distributor and began establishing in-house sales personnel. The US distributor contributed sales of $0.7 million in prior year which we lost due to the termination; this was offset by sales generated by our in-house sales team of $0.3 million resulting to the $0.4 million decrease in U.S. sales in 2024.*

*<u>Cost of Revenues</u>*

*Total cost of revenues decreased by $2.9 million, or 39%, for the year ended December 31, 2024, as compared to the year ended December 31, 2023. The decrease in cost of revenues for the year ended December 31, 2024, was mainly due to a decrease of $1.5 million in overhead costs for the Freedom drivers, $1.0 million in overhead costs for the TAH, and $0.4 million in material usage for the drivers.*

*Overhead includes full capacity costs related to rent, utilities, and wages for engineers, quality, warehouse, and purchasing departments. The primary cause of the reduction in overhead costs was the reduction of headcount in related departments. In 2024 the Company was not operating at full capacity for TAH production, which resulted in this change.*

*The cost of products pertains to the various components of the SynCardia TAH system. These may include, but are not limited to, the following: (i) TAH Kit 70cc, (ii) TAH Kit 50cc, (iii) C2 driver and handpump ("C2 driver"), (iv) Companion Cart Hospital ("Cart"), and (v) Companion Caddy ("Caddy"). Revenue is solely earned upon the sale of a TAH Kit 70cc or a TAH Kit 50cc to the hospital. The C2 driver, Cart, and Caddy are equipment used within the hospital to operate and calibrate the TAH and do not represent a distinct performance obligation, as the customer cannot benefit from the TAH Kit without the C2 driver, Cart, or Caddy. This equipment is not rented, but is provided free of charge to the hospital. The C2 driver, caddy and cart remain in the hospital and are used for multiple patients before maintenance is required. The C2 driver maintenance costs, as well as labor costs of the C2 driver technicians, are included in the Cost of revenues: Products and are expensed as incurred.*

*If a patient is discharged from the hospital with a Freedom driver, the rental revenue is earned over the period of usage. Rental Revenue is recognized when it becomes likely that we will receive payment from our customer, a third party MCS equipment management and distribution company. The timing differences*

*between usage and payment receipt generally do not correlate to the cost of rental, resulting in negative gross margins. Rental costs are related to Freedom driver maintenance costs, which include labor costs of Freedom driver technicians. Freedom driver maintenance costs are incurred on a time schedule that is dependent on the amount of time the Freedom driver is used by a patient. The Freedom driver may be used by multiple patients before maintenance service is required.*

*Our total cost of revenue as a percentage of total sales for the years ended December 31, 2024 and 2023 was 103% and 146%, respectively. This difference is due to decreased costs related to overhead for the Freedom drivers and TAH Kits as discussed above and the decreased revenues related to U.S. distribution changes as discussed in Results of Operations - Revenues above.*

*Research and Development Expenses*

*Research and development expenses increased by $1.2 million, or 53%, for the year ended December 31, 2024, as compared to the year ended December 31, 2023. The increase was primarily attributable to the increase of $0.5 million research and development supplies and the increase of $0.4 million of research and development cost for a preliminary technology study related to driver product development. We do not track expenses by product candidate. While research and development supply expense are isolated by product, personnel are not. Research and Development personnel do not work on current product production, therefore labor expense is not isolated by product.*

*Selling, General and Administrative Expenses*

*Selling, general and administrative expenses decreased by $0.8 million, or 7%, for the year ended December 31, 2024, as compared to the year ended December 31, 2023. The decrease was primarily attributable to a $2.2 million decrease in professional fees, $0.5 million decrease in SOTA termination fee, offset by $0.7 million increase in stock-based compensation, $0.9 million increase in clinical support, and $0.3 million increase in personnel costs.*

*Total Other Expenses*

*Total other expenses increased by $7.3 million, or 10,564%, for the year ended December 31, 2024, as compared to the year ended December 31, 2023. The increase was attributed to interest expense and derivative (non-cash) accounting for the issued Convertible Notes.*

***Comparison of Three Months Ended March 31, 2025 and 2024***

*Revenues*

*Total revenues decreased by $1.4 million or 69% for the three months ended March 31, 2025, as compared to the three months ended March 31, 2024. This decrease is due to a decline in U.S. sales of $1.0 million and foreign sales of $0.3 million. In the three months ended March 31, 2024 and 2025, our largest U.S. customer contributed sales of $1.3 million and $0.3 million, respectively, resulting to the $1.0 million decrease in U.S. sales in the three months ended March 31, 2025.*

*Cost of Revenues*

1

2

3

4

5

6

7

8

*Total cost of revenues decreased by $0.2 million, or 17%, for the three months ended March 31, 2025, as compared to the three months ended March 31, 2024. The decrease in cost of revenues for the three months ended March 31, 2025, was mainly due to $0.2 million decrease in rental costs. Rental revenue and rental cost are not directly correlated. Rental revenue is earned over the period of usage which begins when a patient is discharged from a hospital with a Freedom Driver. The rental costs are mainly related to machine maintenance to maintain reliability and is incurred on a time schedule that is dependent on the amount of time the driver is actually used. The driver may be used for multiple patients before maintenance service is required. Rental Revenue is recognized when it becomes likely that we will receive payment. The timing differences between usage and payment receipt generally do not correlate to the cost of service maintenance, resulting in negative gross margins. Our total cost of revenue as a percentage of total sales for the three months ended March 31, 2025 and 2024 was 158% and 59%, respectively.*

9

*Research and Development Expenses*

10

11

12

13

*Research and development expenses increased by $0.1 million, or 17%, for the three months ended March 31, 2025, as compared to the three months ended March 31, 2024. The increase was primarily attributable to $0.1 million of labor costs. We do not track expenses by product candidate. While research and development supply expense are isolated by product, personnel are not. Research and Development personnel do not work on current product production, therefore labor expense is not isolated by product.*

14

*Selling, General and Administrative Expenses*

15

16

17

*Selling, general and administrative expenses increased by $0.1 million, or 5%, for the three months ended March 31, 2025, as compared to the three months ended March 31, 2024. The increase was primarily attributable to $0.1 million in labor costs.*

18

*Total Other Expenses*

19

20

*Total other expenses increased by $2.2 million, or 2,685%, for the three months ended March 31, 2025 as compared to the three months ended March 31, 2024. The increase was attributed to derivative (non-cash) accounting for the issued convertible notes.*

21

35.    Furthermore, the IPO detailed the company's strengths and strategies that would

22

support the future growth of Picard:

23

**Our Strategy and Competitive Strengths**

24

25

26

27

*We face competition from alternative, often more inexpensive, therapies and other total artificial heart manufacturers. However, we believe that we have, and will maintain for some time, a strong position among total artificial heart manufacturers globally and enjoys certain competitive advantages compared over other total artificial heart manufacturers because of our track record, regulatory approvals, manufacturing processes, sales and marketing expertise and long-term reputation for quality.*

28

CLASS ACTION COMPLAINT

*Development-stage advantages over other Total Artificial Hearts:* We believe that we maintain a strong position among our peers in the total artificial heart category. The SynCardia TAH is the only total artificial heart that is approved for commercial use in the United States and Canada. Of our two direct competitors that have been used in human subjects, Carmat and BiVACOR, the Aeson device by Carmat is approved for commercial use in the EU only (CE mark). Carmat obtained the CE mark in December 2020 under MDD based on clinical data obtained from 5 patients ("ADVANCEHF" Study). Carmat is in the process of re-certifying the Aeson device under MDR. To this end Carmat is conducting a clinical trial that has completed enrollment of 52 patients to generate the clinical data needed to support a CE mark under MDR ("EFICAS" Study). There is no guarantee that results from the EFICAS study will be sufficient to support a CE mark under MDR, and Carmat may have to conduct additional clinical trials. In 2021, Carmat received clearance from the FDA to start an early feasibility study ("EFS") in the U.S. with the aim to enroll 10 patients. Also in 2021, Carmat suspended this EFS following the occurrence of a quality issue affecting some of its implants. In 2024, following the occurrence of software issues that may affect the cardiac cycle of the Aeson, the company recommends transplanting patients with a natural heart as soon as possible. In April 2025, Carmat received FDA's conditional approval to initiate the second cohort of the EFS study in the United States. On June 30, 2025, Carmat announced that it had filed for insolvency with the French commercial court. On July 1, 2025, the court placed Carmat into receivership. Under French insolvency law, Carmat will continue operations during a court-supervised observation period while evaluating strategic options, including a potential sale of assets or business segments. Carmat has publicly stated its intention to continue supporting patients implanted with its Aeson total artificial heart during this period. However, the outcome of the receivership process remains uncertain and may affect the availability of Carmat's products and services globally, including within the United States. The BiVACOR system, which has been implanted in 5 of 20 patients that are part an EFS that started in 2024 at five centers in the U.S., has not obtained approval for any market to date. The BiVACOR heart has also been implanted in one patient in Australia.

36.    As stated previously, the structure of Picard's IPO was intentionally designed to facilitate an eventual pump-and-dump scheme. Picard conducted a low-float IPO, offering just 4,250,000 shares to the public, merely 5% of total outstanding equity, while maintaining overwhelming insider control through preferred super-voting shares, majority control by Hunniwell, and personal loans from Directors.

37.    The thin public float also made Picard's stock uniquely susceptible to price manipulation, as even modest buying pressure could create explosive price moves.

38.    Picard's IPO structure contained several red flags commonly associated with manipulated micro-cap offerings such as OST, JYD and CLEU just to name a few. First, the public float was extremely small, only about 4.25 million shares, representing roughly 5% of the Company's outstanding equity. Such a small float meant that insiders effectively controlled the

1    overwhelming majority of shares.  In offerings of this size, even limited trading activity can

2    materially affect price levels.  A float this thin is atypical for a company that reached a market

3    capitalization exceeding $300 million within weeks.

4        39.    Regulators have cautioned that low-float IPOs are sometimes disproportionately

5    allocated to accounts associated with foreign broker-dealers, creating conditions where a small

6    number of holders can move the market.  The opaque nature of Picard's allocation and the

7    unusually limited public float are consistent with this pattern and further contributed to the

8    susceptibility of PMI shares to coordinated trading activity.  Picard's rapid price escalation after

9    the IPO occurred in the absence of fundamental developments that would justify such an increase.

10        40.    On September 15, 2025, the Company issued a press release announcing financial

11    results for the three and six-months ended June 30, 2025. [5]  It included the following financial

12    highlights among others:

*Second Quarter 2025 Results*

*Revenue for the second quarter of 2025 increased 207% to $2.13 million, compared with $0.69 million in the second quarter of 2024.  Growth was driven entirely by higher U.S. product sales.  Gross loss narrowed to $0.13 million, a 67% improvement compared with the prior year.  Operating loss improved 8% to $3.52 million, versus $3.82 million in the second quarter of 2024.  Net loss was $6.72 million, compared to $4.06 million in the prior year quarter, with the loss increase including a $2.10 million higher non-cash debt discount amortized to interest expense and a $0.72 million increase in derivative loss.*

*Year-to-Date 2025 Results*

*For the six months ended June 30, 2025, revenue rose 3 % to $2.74 million, compared with $2.67 million in the first half of 2024.  Gross loss was $0.49 million, compared with a gross profit of $0.43 million in the same period of 2024.  Operating loss widened to $6.77 million, up 19% from $5.70 million in the prior year period.  Net loss for the first half was $12.29 million, versus $6.01 million in the first half of 2024 with the loss increase including a $2.37 million higher non-cash debt discount amortized to interest expense and a $2.50 million increase in derivative loss.*

*Outlook*

*Following the IPO completed in September, Picard expects to fund operations into 2026 under its current plan.  The company remains focused on driving adoption*

---

[5]    Brittany Lanza, *Picard Medical Reports Second Quarter 2025 Financial Results*, Picard Medical, Inc. (Sep. 15, 2025), https://picardmedical.com/press_releases/picard-medical-reports-second-quarter-2025-financial-results/.

*of its commercially approved total artificial heart and progressing its next-generation fully implantable platform, the Emperor.*

41.     Additionally, Defendant Schnegelsberg was quoted in the September 15th press release stating:

> *"Our second quarter results reflect strong sales growth for the SynCardia total artificial heart," said Patrick NJ Schnegelsberg, Chief Executive Officer of Picard Medical.  "We achieved over 200% revenue growth year-over-year, strengthened our operating profile, and successfully completed our IPO the proceeds of which provide us with the capital to advance development of our next-generation fully implantable heart and expand access to the SynCardia platform globally."*

42.     Lastly, the September 15th press release reiterated that Picard is a "leader with the only commercially available total artificial heart technology," its product offerings, and competitive advantage in the marketplace first published in the IPO.

43.     On September 12, 2025, the Company filed its Form 10-Q with the SEC reporting financial results for the three and six-months ended June 30, 2025, summarized in the September 15th Press release.[6]

44.     On September 18, 2025, the Company filed a proxy statement announcing a shareholder meeting to vote on increasing available shares under the Company's share incentive plan by 18,000,000.[7]  This increase in shares—which were primarily granted to Individual Defendants—was allegedly justifiable based on the following statement by the company:

> *Our Board, the Compensation Committee of the Board (the "Committee") and management believe that the effective use of incentive awards is vital to our ability to help retain and incentivize our employees, officers, directors, consultants, and advisors.  In addition, our future success depends, in large part, upon our ability to maintain a competitive position in attracting, retaining, and motivating key personnel.  We believe that the Amended Incentive Plan is essential to permit our management to continue to provide long-term, equity-based incentives to present and future employees, consultants, and directors.*

---

[6]     Picard  Medical  Inc,  Quarterly  Report  (Form  10-Q)  (Jun.  30.  2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0002030617/000182912625007334/picardmedical_10q.htm.

[7]     Picard  Medical,  Inc.,  Proxy  Statement  (Form  Schedule  14A)  (Sep.  18,  2025), https://www.sec.gov/Archives/edgar/data/2030617/000182912625007497/picardmedical_pre14a.htm#a_002.

CLASS ACTION COMPLAINT

45.    On October 14, 2025, the Company filed an 8-K announcing shareholders had voted and approved the increase to the share incentive program detailed in the September 18th proxy.[8]

46.    On October 24, 2025, the company issued the following statement in response to the 70% drop in share price the day before:

> *Tucson, AZ – October 24, 2025 – Picard Medical, Inc. (NYSE American: PMI) ("Picard" or the "Company"), parent company of SynCardia Systems LLC, maker of the world's first U.S. and Canadian commercially-approved total artificial heart, today announced that it is not aware of any undisclosed material change in the Company's operations or financial condition, that would account for the recent volatility in its stock price.*
>
> *The Company remains focused on executing its strategic and operational priorities and will continue to comply with all disclosure obligations under applicable securities laws.*
>
> *For additional information about Picard Medical, please visit www.picardmedical.com or review the Company's filings with the U.S. Securities and Exchange Commission at www.sec.gov.*

47.    The October 24th press release reiterated that Picard is a "leader with the only commercially available total artificial heart technology" offerings, and competitive advantage in the marketplace first published in the IPO.

48.    Lastly, The October 24th press release was signed by Eric Ribner, Managing Director of LifeSci Advisors, LLC, as the contact for the Company.

## AUDITOR DEFENDANT ALLEGATIONS

49.    The unqualified audit opinion of MaloneBailey covering the two-year period ended December 31, 2024, and interim period ended July 11, 2025, was incorporated into the IPO, registration statements, prospectuses, and other "offerings" of securities the Company filed during the Class Period.   In their opinion, MaloneBailey certified that, "[i]n our opinion, the financial statements present fairly, in all material respects, the financial position of the Company" and that the audits were conducted "in conformity with accounting principles generally accepted in the United States of America ('GAAP')" and "in accordance with the standards of the PCAOB"

---

[8]    Picard Medical, Inc., Current Report (Form 8-K) (Oct. 14, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0002030617/000182912625008062/picardmedical_8k.htm.

which "require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud." They go on to affirm the procedures they performed stating:

> *Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.*

50.     This unqualified audit report incorporated into the IPO and other SEC filings was false and misleading because Picard's consolidated financial statements were not prepared in accordance with GAAP or PCAOB requirements.

51.     In issuing unqualified audit opinions on Picard's financial statements—despite these GAAP and PCAOB violations—MaloneBailey failed to comply with the professional standards dictated by the PCAOB. These standards required MaloneBailey to exercise due professional care in the performance of the audit and to obtain competent, sufficient evidentiary matter to form a basis for their opinion, and to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.[9]

52.     In conducting its audits, MaloneBailey had access to the files and key employees of the Company at all relevant times. As Picard's auditor, MaloneBailey had continuous access to and knowledge of the Company's confidential internal, corporate, financial, operating, and business information, and had the opportunity to observe and review Picard's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements as well as Picard's internal controls and structures. Accordingly, MaloneBailey was aware of significant deficiencies and material weaknesses at the Company. Thus, had MaloneBailey complied with PCAOB standards, they would have determined that there was no reasonable basis for their unqualified audit report because, among other things,

---

[9]     *AS 1000: General Responsibilities of the Auditor in Conducting an Audit*, PCAOB, https://pcaobus.org/oversight/standards/auditing-standards/details/as-1000--general-responsibilities-of-the-auditor-in-conducting-an-audit [https://perma.cc/S4PV-DDED].

CLASS ACTION COMPLAINT

1     MaloneBailey was aware of undisclosed facts tending to seriously undermine the accuracy of its

2     audit reports, its conformity with GAAP and the Company's reported financial metrics.

3                              **THE TRUTH BEGINS TO EMERGE**

4          53.     On October 23, 2025, Picard's stock reached a closing price of $13.20, with an

5     intraday high of $13.68.  At that time, the Company had approximately 73.7M shares outstanding,

6     giving it a market capitalization of around $973 million.

7          54.     During aftermarket trading hours, on October 23, 2025, Picard's stock price

8     abruptly crashed by approximately 70%.  Investigations and public reports have since revealed

9     that Picard's stock was used as a primary vehicle for an illicit "pump-and-dump" promotion

10    scheme.  Impersonators, using stolen identities of legitimate financial advisors, touted Picard in

11    online forums, chat groups, and through social media posts with sensational but baseless claims

12    to create a buying frenzy among retail investors.  The structure of Picard's public listing and low

13    float made the scam possible.

14         55.     Picard itself admits one of their goals in the Prospectus was "actively increasing

15    our presence on social media" as part of enhancing their human capital resources and a key "near-

16    term growth driver."[10] Indeed, Picard and it's "SynCardia" subsidiary do have an active presence

17    on Facebook, X, Instagram and YouTube.  However, despite the Picard IPO taking place in the

18    midst of a microcap stock scam epidemic, where countless thinly floated companies like Picard

19    were being used as vehicles to defraud Nasdaq investors, no warnings were provided to investors

20    to be on alert for false information.[11]  Therefore, at a minimum, by conveying to investors that

---

[10]     Picard Medical, Inc., s*upra* note 3;  *see also*  https://picardmedical.com/wp-content/uploads/2025/05/SynCardia_Systems_LLC-Investor_Deck_FW-Modified_251017.pdf.

[11]     Jeff Horwitz & Engen Tham, *Meta tolerates rampant ad fraud from China to safeguard billions in revenue*, REUTERS (Dec. 15, 2025), https://www.reuters.com/investigations/meta-tolerates-rampant-ad-fraud-china-safeguard-billions-revenue-2025-12-15/;  *see also*  Dave Michaels, *Obscure Chinese Stock Scams Dupe American Investors by the Thousands,* WALL ST. J. (Jun. 16. 2025), https://www.wsj.com/finance/regulation/obscure-chinese-stock-scams-dupe-american-investors-by-the-thousands-8416f795?reflink=desktopwebshare_permalink;  *see also* Dara-Abasi Ita. *Billions Lost by Investors as Meme Stock Scams Surge: 'Pump and Dump' Schemes on the Rise*, Investopedia (Sep. 24., 2025), https://www.investopedia.com/meme-stock-scams-surge-11812439; *see also* Joel M. Cohen et al., *SEC targeting cross-border fraud, with a focus on Chinese companies & gatekeepers,* White & Case (Sep. 16, 2025), https://www.whitecase.com/insight-alert/sec-targeting-cross-border-fraud-focus-chinese-companies-gatekeepers.

**CLASS ACTION COMPLAINT**

1  legitimate information about the Company could be found on social media, without warnings

2  about misinformation despite the obvious risks, the Company, individual defendants,

3  underwriters, and the auditor recklessly disregarded a substantial risk that Picard would be used

4  to orchestrate a pump and dump scheme, if not being knowing participants in the fraud

5  themselves.

6      56.    In support of this inference, as early as September 30, 2025, a mere four weeks

7  after the IPO, reputable sources such as Edwin Dorsey, founder of The Bear Cave, a leading

8  forensic financial research authority, published the following message on his X account calling

9  out Picard to investors as currently being manipulated by fraudsters:[12]



However, despite this known manipulation and danger to investors, none of the Defendants took

action.  As previously stated, it was not until October 24, 2025, the day after Picard's share price

crashed 70% that the company issued an official statement warning investors about the recent

volatility of their share price.

      57.    Here, Plaintiff was a victim of one such impersonator.  After clicking on a

Facebook ad promoting stock advice, Plaintiff was funneled into a WhatsApp Group claiming to

be the firm the advertised financial advisor worked for.  In this WhatsApp group Plaintiff was

---

[12]    Edwin   Dorsey   (@StockJabber),   X   (Sep.   30.   2025   at   1:52   PM),
https://x.com/StockJabber/status/1973083494550229500.

CLASS ACTION COMPLAINT

1    instructed to buy and hold large quantities of PMI stock during the Class Period.  The level of

2    buying PMI was in such great quantities it triggered safeguards at Plaintiff's broker which she

3    was encouraged to circumvent in order to maximize guaranteed returns.  However, in reality this

4    was merely a theft orchestrated by Defendants.  Below are a series of WhatsApp chats evidencing

5    the scheme:[13]





[13]    Edwin Dorsey, *StopNasdaqChinaFraud.com*,
https://www.stopnasdaqchinafraud.com/?tickers=PMI (last visited Feb. 2, 2026).

19

1
2
3
4
5
6
7
8
9
10
11



12   58.   On October 23, 2025, Edwin Dorsey published another message on his X account

13   calling out the Picard IPO and subsequent pump and dump as a fraud:[14]

14
15
16
17
18
19
20
21
22
23



24   59.   Together, the facts alleged by Plaintiff and other class members, along with news

25   releases like those of Mr. Dorsey prove that throughout the Class Period, Picard's stock price was

26   artificially inflated through coordinated social media campaigns where Defendants purposefully

27   ─────────────────────
[14]   Edwin   Dorsey   (@StockJabber),   X   (Oct.   23,   2025   at   4:34   PM)

28   https://x.com/StockJabber/status/1981504546846228870.

1    and/or recklessly disseminated materially false and misleading information about the Company.

2    Through these campaigns, impersonators using stolen identities of legitimate financial advisors

3    lured victims through Facebook/Instagram ads into private investor chat groups on platforms like

4    WhatsApp/Messenger/Threads to circulate unfounded news and generate excitement and raise

5    buying pressure of Picard stock.

6        60.    The statements made by impersonators had no legitimate basis in the Company's

7    actual operations or financial condition, yet they were presented as authoritative tips to lure retail

8    investors into purchasing Picard shares at inflated prices.  By peddling fabricated prospects of

9    imminent corporate success, the scheme misled investors about Picard's value and created

10    artificial demand for the stock.   As previously stated, Picard's IPO and low float were

11    purposefully designed by Defendants to enable this fraudulent scheme to be effectuated.

12                    **CLASS ACTION ALLEGATIONS**

13        61.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

14    Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that

15    purchased or otherwise acquired Picard securities between September 2, 2025, and October 31,

16    2025, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the

17    officers, and directors of the Company, at all relevant times, members of their immediate families

18    and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants

19    have or had a controlling interest.

20        62.    The members of the Class are so numerous that joinder of all members is

21    impracticable.  Throughout the Class Period, Picard's shares actively traded on NASDAQ.  While

22    the exact number of Class members is unknown to Plaintiff at this time and can only be

23    ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or

24    thousands of members in the proposed Class.  Millions of Picard shares were traded publicly

25    during the Class Period on the NASDAQ.  Record owners and other members of the Class may

26    be identified from records maintained by Picard or its transfer agent and may be notified of the

27    pendency of this action by mail, using the form of notice similar to that customarily used in

28    securities class actions.

CLASS ACTION COMPLAINT

63.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

64.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

65.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Picard; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

66.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

67.     The market for Picard's securities was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Picard's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Picard's securities relying upon the integrity of the market price of the Company's securities and market information relating to Picard and have been damaged thereby.

CLASS ACTION COMPLAINT

1    68.    During the Class Period, Defendants materially misled the investing public,

2    thereby inflating the price of Picard's securities, by publicly issuing false and/or misleading

3    statements and/or omitting to disclose material facts necessary to make Defendants' statements,

4    as set forth herein, not false or misleading.  The statements and omissions were materially false

5    and/or misleading because they failed to disclose material adverse information and/or

6    misrepresented the truth about Picard's business, operations, and prospects as alleged herein.

7    69.    At all relevant times, the material misrepresentations, and omissions particularized

8    in this Complaint directly or proximately caused or were a substantial contributing cause of the

9    damages sustained by Plaintiff and other members of the Class.  As described herein, during the

10   Class Period, Defendants made or caused to be made a series of materially false and/or misleading

11   statements about Picard's financial well-being and prospects.  These material misstatements

12   and/or omissions had the cause and effect of creating in the market an unrealistically positive

13   assessment of the Company and its financial well-being and prospects, thus causing the

14   Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants'

15   materially false and/or misleading statements during the Class Period resulted in Plaintiff and

16   other members of the Class purchasing the Company's securities at artificially inflated prices,

17   thus causing the damages complained of herein when the truth was revealed.

18                               **LOSS CAUSATION**

19   70.    Defendants' wrongful conduct, as alleged herein, directly, and proximately caused

20   the economic loss suffered by Plaintiff and the Class.

21   71.    During the Class Period, Plaintiff and the Class purchased Picard's securities at

22   artificially inflated prices and were damaged thereby.  The price of the Company's securities

23   significantly declined when the misrepresentations made to the market, and/or the information

24   alleged herein to have been concealed from the market, and/or the effects thereof, were revealed,

25   causing investors' losses.

26                            **SCIENTER ALLEGATIONS**

27   72.    As alleged herein, Defendants acted with scienter since Defendants: (1) knew that

28   the public documents and statements issued or disseminated in the name of the Company were

materially false and/or misleading; (2) knew that such statements or documents would be issued or disseminated to the investing public; and (3) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Picard, their control over, and/or receipt and/or modification of Picard's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Picard, participated in the fraudulent scheme alleged herein.

73.    Defendants were also aware, or were reckless in disregarding, that PMI's securities carried a heightened susceptibility to social-media-driven manipulation because of the Company's extremely small float.  By the time of the Class Period, the WhatsApp and WeChat impersonator schemes targeting low-float IPOs were known to Defendants.  Defendants' failure to address or disclose this risk, either in the IPO materials or as the fraudulent promotions emerged, supports a strong inference of scienter.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

74.    The market for Picard's securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Picard's securities traded at artificially inflated prices during the Class Period.  On October 23, 2025, the Company's share price reached a Class Period high of $13.68 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Picard's securities and market information relating to the Company and have been damaged thereby.

75.    During the Class Period, the artificial inflation of Picard's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Picard's business, prospects, and operations.  These material misstatements

1    and/or omissions created an unrealistically positive assessment of Picard and its business,

2    operations, and prospects, thus causing the price of the Company's securities to be artificially

3    inflated at all relevant times, and, when disclosed, negatively affected the value of the Company

4    shares.  Defendants' materially false and/or misleading statements during the Class Period

5    resulted in Plaintiff and other members of the Class purchasing the Company's securities at

6    artificially inflated prices, and each of them has been damaged as a result.

7          76.    At all relevant times, the market for Picard's securities was an efficient market for

8    the following reasons, among others:

9          (a)    Picard shares met the requirements for listing, and was listed and actively traded

10                on the NASDAQ, a highly efficient and automated market;

11         (b)    as a regulated issuer, Picard filed periodic public reports with the SEC and/or the

12                NASDAQ;

13         (c)    Picard regularly communicated with public investors via established market

14                communication mechanisms, including through regular dissemination of press

15                releases on the national circuits of major newswire services and through other

16                wide-ranging public disclosures, such as communications with the financial press

17                and other similar reporting services; and/or

18         (d)    Picard was followed by securities analysts employed by brokerage firms who

19                wrote reports about the Company, and these reports were distributed to the sales

20                force and certain customers of their respective brokerage firms.  Each of these

21                reports was publicly available and entered the public marketplace.

22         77.    As a result of the foregoing, the market for Picard's securities promptly

23    digested current information regarding Picard from all publicly available sources and reflected

24    such information in Picard's share price.  Under these circumstances, all purchasers of the

25    Company's securities during the Class Period suffered similar injury through their purchase of

26    Picard's securities at artificially inflated prices and a presumption of reliance applies.

27         78.    A Class-wide presumption of reliance is also appropriate in this action under

28    the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

25

**CLASS ACTION COMPLAINT**

1  (1972), because the Class's claims are, in large part, grounded on Defendants' material

2  misstatements and/or omissions.  Because this action involves Defendants' failure to disclose

3  material adverse information regarding the Company's business operations and financial

4  prospects—information that Defendants were obligated to disclose—positive proof of reliance is

5  not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the

6  sense that a reasonable investor might have considered them important in making investment

7  decisions.  Given the importance of the Class Period material misstatements and omissions set

8  forth above, that requirement is satisfied here.

9                                    **NO SAFE HARBOR**

10          79.     The statutory safe harbor provided for forward-looking statements under certain

11  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

12  The statements alleged to be false and misleading herein all relate to then-existing facts and

13  conditions.  In addition, to the extent certain of the statements alleged to be false may be

14  characterized as forward looking, they were not identified as "forward-looking statements" when

15  made and there were no meaningful cautionary statements identifying important factors that could

16  cause actual results to differ materially from those in the purportedly forward-looking statements.

17  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-

18  looking statements pleaded herein, Defendants are liable for those false forward-looking

19  statements because at the time each of those forward-looking statements was made, the speaker

20  had actual knowledge that the forward-looking statement was materially false or misleading,

21  and/or the forward-looking statement was authorized or approved by an executive officer of

22  Picard who knew that the statement was false when made.

23                                      **FIRST CLAIM**
    **Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder**
24                               **Against All Defendants**

25          80.     Plaintiff repeats and re-alleges each and every allegation contained above as if

26  fully set forth herein.

27          81.     During the Class Period, Defendants carried out a plan, scheme and course of

28  conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

1    public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and

2    other members of the Class to purchase Picard's securities at artificially inflated prices.   In

3    furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant,

4    took the actions set forth herein.

5         82.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made

6    untrue statements of material fact and/or omitted to state material facts necessary to make the

7    statements not misleading; and (iii) engaged in acts, practices, and a course of business which

8    operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

9    maintain artificially high market prices for Picard's securities in violation of Section 10(b) of the

10    Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the

11    wrongful and illegal conduct charged herein or as controlling persons as alleged below.

12        83.    Defendants, individually and in concert, directly and indirectly, by the use, means

13    or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

14    continuous course of conduct to conceal adverse material information about Picard's financial

15    well-being and prospects, as specified herein.

16        84.    Defendants employed devices, schemes and artifices to defraud, while in

17    possession of material adverse non-public information and engaged in acts, practices, and a course

18    of conduct as alleged herein in an effort to assure investors of Picard's value and performance

19    and continued substantial growth, which included the making of, or the participation in the

20    making of, untrue statements of material facts and/or omitting to state material facts necessary in

21    order to make the statements made about Picard and its business operations and future prospects

22    in light of the circumstances under which they were made, not misleading, as set forth more

23    particularly herein, and engaged in transactions, practices, and a course of business which

24    operated as a fraud and deceit upon the purchasers of the Company's securities during the Class

25    Period.

26        85.    Each of the Individual Defendants' primary liability and controlling person

27    liability arises from the following facts: (i) the Individual Defendants were high-level executives

28    and/or directors at the Company during the Class Period and members of the Company's

27

1   management team or had control thereof; (ii) each of these Defendants, by virtue of their

2   responsibilities and activities as a senior officer and/or director of the Company, was privy to and

3   participated in the creation, development and reporting of the Company's internal budgets, plans,

4   projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and

5   familiarity with the other Defendants and was advised of, and had access to, other members of the

6   Company's management team, internal reports and other data and information about the Company's

7   finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of

8   the Company's dissemination of information to the investing public which they knew and/or

9   recklessly disregarded was materially false and misleading.

10       86.    Defendants had actual knowledge of the misrepresentations and/or omissions of

11   material facts set forth herein or acted with reckless disregard for the truth in that they failed to

12   ascertain and to disclose such facts, even though such facts were available to them.  Such

13   Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

14   for the purpose and effect of concealing Picard's financial well-being and prospects from the

15   investing public and supporting the artificially inflated price of its securities.  As demonstrated

16   by Defendants' overstatements and/or misstatements of the Company's business, operations,

17   financial well-being, and prospects throughout the Class Period, Defendants, if they did not have

18   actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to

19   obtain such knowledge by deliberately refraining from taking those steps necessary to discover

20   whether those statements were false or misleading.

21       87.    As a result of the dissemination of the materially false and/or misleading

22   information and/or failure to disclose material facts, as set forth above, the market price of

23   Picard's securities was artificially inflated during the Class Period.  In ignorance of the fact that

24   market prices of the Company's securities were artificially inflated, and relying directly or

25   indirectly on the false and misleading statements made by Defendants, or upon the integrity of

26   the market in which the securities trades, and/or in the absence of material adverse information

27   that was known to or recklessly disregarded by Defendants, but not disclosed in public statements

28

1   by Defendants during the Class Period, Plaintiff and the other members of the Class acquired

2   Picard's securities during the Class Period at artificially high prices and were damaged thereby.

3          88.     At the time of said misrepresentations and/or omissions, Plaintiff and other

4   members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff

5   and the other members of the Class and the marketplace known the truth regarding the problems

6   that Picard was experiencing, which were not disclosed by Defendants, Plaintiff and other

7   members of the Class would not have purchased or otherwise acquired their Picard securities, or,

8   if they had acquired such securities during the Class Period, they would not have done so at the

9   artificially inflated prices which they paid.

10        89.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act

11   and Rule 10b-5 promulgated thereunder.

12        90.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and

13   the other members of the Class suffered damages in connection with their respective purchases

14   and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**<u>Against the Individual Defendants</u>**

17        91.     Plaintiff repeats and re-alleges each and every allegation contained above as if

18   fully set forth herein.

19        92.     Individual Defendants acted as controlling persons of Picard within the meaning

20   of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions

21   and their ownership and contractual rights, participation in, and/or awareness of the Company's

22   operations and intimate knowledge of the false financial statements filed by the Company with

23   the SEC and disseminated to the investing public, Individual Defendants had the power to

24   influence and control and did influence and control, directly or indirectly, the decision-making of

25   the Company, including the content and dissemination of the various statements which Plaintiff

26   contends are false and misleading.  Individual Defendants were provided with or had unlimited access

27   to copies of the Company's reports, press releases, public filings, and other statements alleged by

28

1    Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability

2    to prevent the issuance of the statements or cause the statements to be corrected.

3        93.    In particular, Individual Defendants had direct and supervisory involvement in the

4    day-to-day operations of the Company and, therefore, had the power to control or influence the

5    particular transactions giving rise to the securities violations as alleged herein, and exercised the

6    same.

7        94.    As set forth above, Picard and Individual Defendants each violated Section 10(b)

8    and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

9    position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the

10    Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and

11    other members of the Class suffered damages in connection with their purchases of the

12    Company's securities during the Class Period.

13                          **PRAYER FOR RELIEF**

14    WHEREFORE, Plaintiff prays for relief and judgment, as follows:

15    (a)    determining that this action is a proper class action under Rule 23 of the Federal

16          Rules of Civil Procedure;

17    (b)    awarding compensatory damages in favor of Plaintiff and the other Class members

18          against all Defendants, jointly and severally, for all damages sustained as a result

19          of Defendants' wrongdoing, in an amount to be proven at trial, including interest

20          thereon;

21    (c)    awarding Plaintiff and the Class their reasonable costs and expenses incurred in

22          this action, including counsel fees and expert fees; and

23    (d)    such other and further relief as the Court may deem just and proper.

24                          **JURY TRIAL DEMANDED**

25    Plaintiff hereby demands a trial by jury.

26    DATED: February 2, 2026        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

27                       */s/* John T. Jasnoch
                       John T. Jasnoch (CA 281605)

28                        600 W. Broadway, Suite 3300

San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com

Sean T. Masson (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Ave, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
smasson@scott-scott.com

Tom Grady (*pro hac vice* forthcoming)
GRADYLAW
720 Fifth Avenue South, Suite 200
Naples, Florida 34102
tgrady@gradylaw.com

*Counsel for Plaintiff and the Proposed Class*

<u>**CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS**</u>

I, Julianne Louie, hereby certify that the following is true and correct to the best of my knowledge information and belief:

1.      I have reviewed the complaint in this action and authorized Scott+Scott Attorneys at Law to file a lead plaintiff motion on my behalf.

2.      I am willing to serve as a representative party on behalf of all persons and entities that purchased, or otherwise acquired, shares of Picard Medical, Inc. ("PMI").

3.      During the relevant period, I purchased and/or sold the security that is the subject of the complaint, as set forth in the attached **Schedule A.**

4.      I did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

5.      During the three-year period preceding the date of my signing this Certification, I am serving, as a representative party or lead plaintiff on behalf of a class in the following private action arising under the Securities Act or the Exchange Act:

      a.   *Louie v. Charming Medical Limited, et al.*, Case No.: 1:25-cv-10535-JPO

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond the *pro rata* share of any recovery, expert for such reasonable costs and expenses (including lost wages) directly related to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____1/30/2026_____ 2026 at ___san francisco, ca___ (city, state).

Signed by:

_____
17D013654F0D47A...

Julianne Louie

### SCHEDULE A

| Transaction | Date | Shares | Price |
|:---:|:---:|:---:|:---:|
| BUY | 10/9/2025 | 530 | $9.09 |
| SALE | 10/15/2025 | 530 | $10.45 |
| BUY | 10/22/2025 | 17741 | $12.40 |
| BUY | 10/22/2025 | 1290 | $12.40 |
| BUY | 10/22/2025 | 6300 | $12.40 |
| SALE | 10/27/2025 | 17741 | $4.8725 |
| SALE | 10/27/2025 | 1290 | $4.89 |
| SALE | 10/27/2025 | 6300 | $4.89 |