**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiffs*
*and the Class*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

JULIANNE LOUIE, Individually and on Behalf of All Others Similar Situated

Plaintiff,

v.

PICARD MEDICAL, INC.; PATRICK NJ SCHNEGELSBERG; BERNARD SKAGGS; MATT SCHUSTER; YUNCAI "RICHARD" FANG; CHRIS HSIEH; WESTPARK CAPITAL, INC.; SENTINEL BROKERS COMPANY, INC.; R.F. LAFFERTY & CO. INC.; AMERICAN TRUST INVESTMENTS; AND MALONEBAILEY, LLP,

Defendants.

Case No. 3:26-cv-01024-RFL

Honorable Rita F. Lin

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

CLASS ACTION

DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS


I. NATURE OF THE ACTION .......... 1

II. JURISDICTION AND VENUE .......... 4

III. PARTIES .......... 4

IV. DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT .......... 6

A. Factual Chronology Demonstrating the Known Ramp-and-Dump Threat at the Time of PMI's IPO .......... 6

B. Picard Medical's Misleading Registration Statement .......... 16

C. Statutory Framework Applicable to the Registration Statement: Item 105 and Item 303 .......... 18

D. Post-IPO Developments .......... 20

E. The Underwriter Defendants Violated the Securities Act .......... 29

V. CLASS ACTION ALLEGATIONS .......... 31

VI. CAUSES OF ACTION .......... 32

COUNT I .......... 32

COUNT II .......... 33

VII. PRAYER FOR RELIEF .......... 33

VIII. JURY TRIAL DEMANDED .......... 34

Lead Plaintiffs Roger Wiegley and Sobhy Abdelhady and Named Plaintiff Nicholas Boldery (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Picard Medical, Inc. ("Picard Medical" or the "Company"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased the common stock of Picard Medical in the Company's Initial Public Offering ("IPO"), which closed on September 2, 2025, or purchased Picard Medical common stock pursuant and/or traceable to the Company's registration statement and prospectus (together, the "Registration Statement") issued in connection with the IPO.[1] This Complaint seeks to recover damages to Class members caused by Defendants' violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2. As early as 2021, regulators and commentators the world over had identified a troubling trend: IPO-related ramp-and-dump schemes targeting a specific type of issuer and placing its investors at great risk.

3. In November 2022, FINRA, Nasdaq, and NYSE issued coordinated alerts warning that small-cap IPOs are vulnerable to ramp-and-dump schemes, identifying limited public float,

[1] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of Picard Medical; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

small offering size, Chinese operations and highly concentrated allocations as key red flags that make a newly public company particularly susceptible.

4. In 2023, FINRA reiterated these risk factors, cautioning: "These schemes have been more commonly found in relation to IPOs raising less than $25 million and issuing fewer than 20 million shares, with issuer valuations under $100 million. Limited public float means that only a small portion of overall shares is available to the public. When a company has limited public float, its shares can be more volatile and harder for investors to sell."

5. In July 2025, the month before PMI began to trade publicly, the FBI also warned about the known pattern of bad actors targeting U.S. investors through social media and messaging apps in ramp-and-dump schemes involving low-priced, highly concentrated IPOs of new or emerging companies.

6. Then, in the weeks immediately before PMI went public, multiple U.S.-listed microcap stocks collapsed after exactly this sort of scheme, with, for instance, the Financial Times reporting that seven Nasdaq-listed Chinese microcap companies had crashed due to ramp-and-dump manipulation in July 2025 alone.

7. In this context, Picard Medical went public. It sold 4,250,000 shares of its common stock at $4.00 per share, pursuant to the final prospectus dated August 29, 2025. The IPO generated $17.0 million in gross proceeds.

8. Picard Medical is a holding company that owns SynCardia Systems, LLC, the manufacturer and seller of the SynCardia Total Artificial Heart, which PMI describes as the only FDA-approved implantable total artificial heart.

9. PMI received approximately $15.4 million in net proceeds in the IPO, which, according to the Registration Statement, was to go toward supporting operations, funding SynCardia Medical (Beijing), Inc. in connection with distribution rights in China, funding research and development for its artificial heart, repaying related-party debt and working-capital loans, and for other general corporate purposes.

10. At the time of the IPO, PMI was controlled by Hunniwell Picard I, LLC ("Hunniwell"), which PMI described as a manager-managed venture capital fund. PMI disclosed

that Hunniwell was managed by Hunniwell Picard GP, LLC, and that its voting decisions required the unanimous vote of three partners: Yuncai "Richard" Fang, Sinyew "Daniel" Teo, and Chris Hsieh. PMI further disclosed that, following the IPO, Hunniwell would beneficially own approximately 54.8% of the Company's outstanding common stock, making PMI a "controlled company" under applicable NYSE rules. Hunniwell is part of Hunniwell Lake Ventures LLC, an investment group formed in 2019 with its headquarters in Palo Alto, California, which is also managed by Fang and Teo.

11. The IPO created an extremely small public float: PMI sold just 4,250,000 shares to public investors, representing approximately 5.9% of the 72,324,145 shares outstanding after the offering, while existing stockholders, including Hunniwell and other pre-IPO holders and insiders, retained the other approximately 94.1%. Accordingly, although PMI became publicly traded through the IPO, the Company's highly concentrated ownership structure and extremely small float meant that the public market was limited to a small sliver of the Company's equity. The overwhelming majority of shares was retained by Hunniwell and other pre-IPO holders, which made PMI's stock extremely vulnerable to precisely the sort of ramp-and-dump manipulation described above.

12. While the Registration Statement contained generic warnings that PMI's common stock could be volatile, that no prior public market for this stock existed, and that an active trading market might not develop or be sustained, it did not disclose the specific, known risk that PMI's $4.00, low-float IPO structure made its shares susceptible to ramp-and-dump manipulation, including artificial price inflation through social-media and messaging-app promotion, coordinated trading, artificial scarcity, and then dumping into pumped-up retail demand; a time-tested way of causing a catastrophic crash.

13. After the IPO, the undisclosed ramp-and-dump risk materialized in precisely the manner it had for so many other similarly situated low-priced, low-float small-cap issuers: PMI's shares were promoted through social-media and messaging-app misinformation, impersonated financial professionals, and artificial trading activity, causing the stock price to soar before coordinated selling dumped shares into the induced retail demand and triggered a collapse, with the

stock tumbling precipitously from an all-time high of approximately $13.68 per share on October 23, 2025. The insiders selling their holdings into the pumped-up demand profited handsomely; the retail investors never stood a chance. Today the stock trades for pennies.

## II. JURISDICTION AND VENUE

14. The claims alleged herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o.

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. §77v).

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as the alleged misstatements entered and subsequent damages took place within this judicial district. In addition, Hunniwell Lake Ventures, LLC, is headquartered in this District.

17. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the false and misleading statements alleged herein into this District, soliciting purchasers of Picard Medical securities in this District.

## III. PARTIES

18. Lead Plaintiff Roger Wiegley purchased Picard Medical common stock pursuant and traceable to the Registration Statement. His PSLRA certification was previously filed with the Court and is incorporated by reference. Dkt. No. 18-2.

19. Lead Plaintiff Sobhy Abdelhady purchased Picard Medical common stock pursuant and traceable to the Registration Statement. His PSLRA certification was previously filed with the Court and is incorporated by reference. Dkt. No. 18-2.

20. Named Plaintiff Nicholas Boldery purchased Picard Medical common stock pursuant and traceable to the Registration Statement. His PSLRA certification is filed herewith.

21. Defendant Picard Medical – a holding company that owns SynCardia Systems, LLC, maker of the SynCardia Total Artificial Heart – is a Delaware corporation with its principal headquarters located in Tucson, Arizona. Picard Medical is controlled by Hunniwell, a manager-managed venture capital fund run by Fang, Teo, and Hsieh. Hunniwell is part of Hunniwell Lake Ventures LLC, an investment group located in Palo Alto, California, which is managed by Fang and Teo. The Company's stock has traded on the NYSE American under the symbol "PMI" since trading began on August 29, 2025.

22. Defendant Partick NJ Schnegelsberg ("Schnegelsberg") was the Company's Chief Executive Officer ("CEO") at all relevant times. Defendant Schnegelsberg signed the signature page to Picard Medical's final amendment to the Registration Statement, filed with the SEC on Form S-1/A on August 6, 2025 (the "S-1/A"), both on behalf of the Company and in his capacity as the Company's Chief Executive Officer and Director.

23. Defendant Bernard Skaggs ("Skaggs") was the Company's Chief Financial Officer ("CFO") at all relevant times. Defendant Skaggs signed the signature page to the S-1/A in his capacity as the Company's Chief Financial Officer.

24. Defendant Yuncai "Richard" Fang ("Fang") was a Director of the Company and Managing Director of Hunniwell Lake Ventures, LLC at all relevant times. Defendant Fang signed the signature page to the S-1/A in his capacity as Director.

25. Defendant Chris Hsieh ("Hsieh") was a Director of the Company and Managing Director of Hunniwell Lake Ventures, LLC at all relevant times. Defendant Hsieh signed the signature page to the Form S-1/A in his capacity as Director.

26. Defendants Schnegelsberg, Skaggs, Fang and Hsieh, all of whom signed the S-1/A in their official capacities and are liable for material misstatements and omissions in the Registration Statement, are collectively referred to herein as the "Individual Defendants."

27. Defendant WestPark Capital, Inc. ("WestPark") was the Company's principal underwriter for the September 2, 2025, IPO.

28. Defendant Sentinel Brokers Company, Inc. ("Sentinel") was an underwriter for the Company's September 2, 2025, IPO.

29. Defendant R.F. Lafferty & Co., Inc. ("Lafferty") was an underwriter for the Company's September 2, 2025, IPO.

30. Defendant American Trust Investment Services ("American Trust") was an underwriter for the Company's September 2, 2025, IPO.

31. Defendants WestPark, Sentinel, Lafferty and American Trust are collectively referred to herein as the "Underwriter Defendants").

32. Picard Medical, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as "Defendants."

## IV. DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT

### A. Factual Chronology Demonstrating the Known Ramp-and-Dump Threat at the Time of PMI's IPO

33. For years leading up to PMI's IPO on August 29, 2025, regulators, stock exchanges, law enforcement agencies and others had repeatedly identified a specific market-manipulation pattern that affected low-priced, low-float, newly public small-cap issuers. The circumstances of PMI's IPO – its $4.00 offering price, its 4.25 million-share offering, its $17 million raise, its Chinese operations, the fact that only 5.9% of PMI's post-IPO shares were included in the public float and the absence of any prior public market for PMI's shares – fit this well-documented pattern to a tee. Yet despite the known trend of ramp-and-dump manipulation and the specific facts making PMI particularly vulnerable, the Registration Statement contained only generic warnings about volatility and the absence of a prior market, and did not disclose that PMI's offering structure created a heightened risk of artificial price inflation and collapse through a coordinated ramp-and-dump scheme.

34. On May 20, 2021, Hong Kong's Securities and Futures Commission and the Stock Exchange of Hong Kong Limited put out a *Joint statement on IPO-related misconduct* (the Joint Statement).[2] The Joint Statement observed:

> An increasing number of suspected "ramp-and-dump" schemes have been associated with IPOs launched in recent years. A ramp-and-dump scheme is a form

[2] *Joint statement on IPO-related misconduct*, Securities and Futures Commission & The Stock Exchange of Hong Kong Limited, May 20, 2021, https://www.sfc.hk/-/media/EN/files/COM/Statements/SFC-HKEX_Joint-Statement_EN.pdf.

> of stock market manipulation where fraudsters use different means to "ramp" up the share price of a listed company and then induce unwary investors to purchase the shares that the fraudsters then "dump" at an artificially high price. The schemes are typically conducted using social media platforms.

35. It depicted a model ramp-and-dump scheme this way:

*Example:*




36. The Joint Statement also identified the features that made IPOs especially vulnerable to this type of manipulation, including small market capitalization, high concentration of IPO shares and relatively small public float, and further cautioned that IPO allocations could be used to send false pricing signals to the market and enable manipulation in the months following the listing.

37. On November 17 2022, FINRA, NASDAQ, and the New York Stock Exchange issued coordinated notices warning investors of ramp and dump schemes aimed at small-cap IPOs on American stock exchanges.

38. On that day, FINRA published Regulatory Notice 22-25, entitled *Heightened Threat of Fraud*, with the subtitle: *FINRA Alerts Firms to Recent Trend in Small-Capitalization IPOs*.[3]

[3] *Heightened Threat of Fraud*: *FINRA Alerts Firms to Recent Trend in Small-Capitalization IPOs*, FINRA, November 17, 2022, https://www.finra.org/rules-guidance/notices/22-25.

FINRA "alert[ed] members to an emerging threat to customers and members, where FINRA, NASDAQ and NYSE have observed initial public offerings (IPOs) for certain small capitalization (small-cap) issuers listed on U.S. stock exchanges that may be the subject of pump-and-dump-like schemes (sometimes referred to as 'ramp-and-dump' schemes)."

39. FINRA continued that it "has observed significant unusual price increases on the day of or shortly after the IPOs of certain small-cap issuers, most of which involve issuers with operations in other countries. FINRA has concerns regarding potential nominee accounts that invest in the small-cap IPOs and subsequently engage in apparent manipulative limit order and trading activity."

40. Synthesizing the common elements of the IPOs affected, FINRA explained that they were typically characterized by a small market capitalization and limited public float, as "each IPO typically raised less than $25 million and valued each issuer at less than $100 million, with the IPO typically issuing fewer than 20 million shares;" many were foreign issuers or issuers that had operating subsidiaries abroad, particularly in China; and many had highly concentrated allocations of IPO shares. FINRA noted that many of these IPOs experienced significant price spikes and drops not driven by news or material events but by social media scams.

41. FINRA implored its members to be vigilant against this rising threat and reminded firms involved in IPOs that they play a critical gatekeeping function in ensuring that registration statements are accurate, complete, and can be relied upon by investors:

> As noted above, the schemes are evolving, and members should pay close attention to suspicious trends in the marketplace and how they may affect members' obligations. FINRA encourages members to continuously evaluate and adapt their supervisory systems as well as compliance and risk management programs to ensure that they are monitoring for and addressing this threat.
>
> Firms that act as underwriters in offerings of securities serve as the "link in the distribution of securities from issuers to investors," and underwriters perform an important role as "gatekeepers to the public markets." This role subjects underwriters to potential liability under Sections 11 and 12 of the Securities Act of 1933, providing a strong incentive for underwriters to help ensure the accuracy of disclosures in registration statements.
>
> Underwriters can raise a "due diligence" defense offering protection against such liability only if they establish that, after reasonable investigation, they had

> reasonable grounds to believe the statements made in the registration statement were true and that there were no omissions of material facts.

42. On the same day, NASDAQ released Equity Regulatory Alert #2022 – 9, entitled *Regulatory Considerations for Small Capitalization IPOs*.[4] NASDAQ began by explaining:

> As a national securities exchange, Nasdaq has a regulatory responsibility to protect investors, promote capital formation and maintain market integrity. Recently, we have observed instances of unusually high price spikes immediately following the pricing of certain initial public offerings (IPOs) on U.S. exchanges, mostly with respect to small-cap companies whose offerings are less than $25 million. In many instances, the IPO securities that are the subject of these extreme price spikes then experience equally dramatic price declines to a level at or below the offering price. These extreme price spikes may occur in the opening trade on an exchange, or in continuous trading on the day of, or days immediately following, the listing. Nasdaq Regulation is concerned that the pattern described above negatively impacts the ability of the securities markets to operate in a fair and orderly manner, to the detriment of investors.

43. NASDAQ's alert when on to list a series of questions that underwriters should consider in the context of small-cap IPOs, in light of the manipulative trading concerns widely felt in this part of the market, reminding underwriters that "it behooves them to conduct a due diligence review to assess whether the registration statement is complete and accurate and does not contain misleading information or material omissions."

44. Also the same day, the New York Stock Exchange issued a public memorandum, entitled *Regulatory Scrutiny in Connection with IPOs*, explaining that it was acting "in response to recent instances of unusual price movement following certain initial public offerings ('IPOs') on U.S. exchanges," and expressing similar concerns to the FINRA and NASDAQ alerts.[5]

---

[4] *Regulatory Considerations for Small Capitalization IPOs,* NASDAQ, November 17, 2022, https://www.nasdaqtrader.com/MicroNews.aspx?id=ERA2022-9.

[5] *Regulatory Scrutiny in Connection with IPOs,* New York Stock Exchange, November 17, 2022, https://www.nyse.com/publicdocs/nyse/markets/nyse/rule-interpretations/2022/NYSER_Reg_Memo_-_Regulatory_Scrutiny_in_Connection_with_IPOs_(2022.11.17_final).pdf.

45. The Wall Street Journal ran an article on this trio of notices on November 17, 2022, entitled: *Finra Warns of Small-Cap IPO Manipulation*.[6] The Wall Street Journal reported:

> The Financial Industry Regulatory Authority, Wall Street's self-regulator, alerted its members to what it calls "a heightened threat of fraud" associated with unusual price spikes in small-cap IPOs on U.S. stock exchanges.
>
> The regulatory notice published Thursday warned that certain small-cap issuers—typically those that raised less than $25 million—may be subjected to pump-and-dump-like schemes, which appear to be linked to social media scams.
>
> Finra said many of the issuers, or their affiliates, maintain their primary operations in China, with broker-dealers in Hong Kong being allocated a significant portion of IPO shares, sometimes as much as 90% or more of the public float. The concentration of shares being held in very few hands makes these listings vulnerable to price manipulation.

46. On March 30, 2023, FINRA issued another warning on this subject, entitled *This On-Ramp Could Lead You to a Dump*.[7]

47. This alert elaborated on the difference between a traditional pump-and-dump scheme and the ramp-and-dump schemes currently running rampant in the small-cap IPO market. It explained:

> A ramp-and-dump scheme is a type of pump-and-dump scheme. Traditionally, the price manipulation in pump-and-dump schemes is the result of falsified, heavily promoted news, financial statements or other marketing communications and might include suspicious trading activity.
>
> In this variation, the price manipulation is primarily the result of controlled trading activity conducted by the bad actors behind the scam. Ultimately, the outcome for unsuspecting investors is the same—a catastrophic collapse in share price that leaves investors with unrecoverable losses.
>
> This alert reiterated many of the red flags set out in FINRA's prior alert, stating that: "These schemes have been more commonly found in relation to IPOs raising less than $25 million and issuing fewer than 20 million shares, with issuer valuations under $100 million. Limited public float means that only a small portion of overall

---

[6] Michelle Chan, *Finra Warns of Small-Cap IPO Manipulation*, The Wall Street Journal, November 17, 2022, https://www.wsj.com/livecoverage/stock-market-news-today-11-17-2022/card/finra-warns-of-small-cap-ipo-manipulation-FZVQFC3WjbRsUzUmHkls.

[7] *This On-Ramp Could Lead You to a Dump*, FINRA, March 30, 2023, https://www.finra.org/investors/insights/ramp-and-dump-schemes.

> shares is available to the public. When a company has limited public float, its shares can be more volatile and harder for investors to sell."

48. FINRA posted yet another warning on April 24, 2025, entitled *Avoiding Pump-and-Dump Scams*, again noting that FINRA and other securities regulators have called attention to the recent spate of ramp-and-dump schemes in connection with some small cap stocks listed on exchanges.[8]

49. On July 3, 2025, the FBI issued a Public Service Announcement, Alert Number I-070325-PSA, entitled: *Fraudsters Target US Stock Investors through Investment Clubs Accessed on Social Media and Messaging Applications*.[9] The FBI cautioned:

> The FBI warns the public about criminals targeting US stock investors through social media platforms and messaging service applications (apps). The scheme, known as a "ramp-and-dump" stock manipulation, targets US investors through online engagement, often via social media advertisements or messages promoting an "investment club" of fellow investors, some of which may be bots or fake accounts. These promotions typically direct victims to secure messaging apps where the group operates. To appear credible, perpetrators may impersonate legitimate brokerage firms or well-known stock analysts. They secretly control a large volume of a low-priced stock and coordinate efforts to inflate its price ("ramp up") by encouraging investment club members to purchase shares over a period of several weeks or months. Once the price is artificially elevated, the criminals sell off ("dump") their shares at a profit, leaving unsuspecting investors with significant losses as the stock value collapses.

50. In addition to providing tips for investors to recognize and avoid ramp-and-dump schemes, the FBI reported that: "So far in 2025, the FBI has seen at least a 300 percent increase in victim complaints referencing ramp-and-dump stock fraud from 2024."

---

[8] *Avoiding Pump-and-Dump Scams*, FINRA, April 24, 2025, https://www.finra.org/investors/insights/pump-and-dump-scams.

[9] *Fraudsters Target US Stock Investors through Investment Clubs Accessed on Social Media and Messaging Applications*, FBI, July 3, 2025, https://www.ic3.gov/PSA/2025/PSA250703.

51. On July 17, 2025, in the wake of one of the many ramp-and-dump schemes, the FBI released a victim impact notice, seeking to identify potential victims of the ramp-and-dump scheme involving Ostin Technology Group Co. LTD (Nasdaq: "OST").[10] The FBI stated:

> Starting in or about April 2025, individuals allegedly impersonating U.S.-based financial professionals on social media and messaging platforms made false representations and instructed investors to purchase shares of OST stock, promising significant returns on investment. These false representations and resulting investment activity artificially "pumped" up the price of OST stock. On June 26, 2025, OST's share price dropped from a high of $9.40 to a closing price of $0.55, resulting in large losses for investors. If you and/or your minor dependent(s) were victimized by this scheme or have information relevant to this investigation, please fill out this short form.

52. A few weeks later, on July 29, 2025, Bloomberg ran an article covering the crescendo of ramp-and-dump schemes, this one focused on a Nasdaq-listed Chinese health care company, Pheton Holdings Ltd., which had just lost 90% of its value in a matter of minutes after a research report identified it as the target of ramp-and-dump manipulation.[11]

53. The research report the Bloomberg article referred to is a substack newsletter written by financial researcher Edwin Dorsey, which explained that: "Overseas scammers have promoted Pheton stock on rumors that Gilead Sciences (NASDAQ: GILD — $141 billion) will soon acquire or partner with Pheton, with an anticipated transaction date of August 6, 2025. These unsubstantiated rumors match a familiar pattern in which overseas stock scammers promote tightly held U.S.-listed Chinese companies on the basis of spurious M&A rumors, only for them to later experience sudden intraday stock collapses, often falling 90% or more."[12] The report collected numerous recent examples of this phenomenon, including Ostin Technology Group (94% collapse); China Liberal

[10] *Seeking Victim Information in "Pump-and-Dump" Investigation*, FBI, July 17, 2025, https://www.fbi.gov/how-we-can-help-you/victim-services/seeking-victim-information/seeking-victim-information-in-pump-and-dump-investigation.

[11] Carmen Reinicke, *Chinese Stock Loses 90% in Minutes After Pump-and-Dump Warning*, Bloomberg, July 29, 2025, https://www.bloomberg.com/news/articles/2025-07-29/chinese-stock-loses-90-in-minutes-after-pump-and-dump-warning?embedded-checkout=true.

[12] Edwin Dorsey, *Problems at Pheton Holdings (PTHL)*, The Bear Cave, July 29, 2025, https://thebearcave.substack.com/p/problems-at-pheton-holdings-pthl.

Education Holdings (98% collapse); and Jayud Global Logistics (95% collapse), and stated: "Today, the pattern is repeating with PTHL."

54. The Bloomberg article elaborated on the PTHL situation and provided even more examples:

> The stock is just the latest example of wild trading moves seen in Chinese companies that trade on Nasdaq. Ruanyun Edai Technology Inc., which listed in April, shed 91% on July 14. Park Ha Biological Technology Co., a skincare product developer, lost 93% on July 8. Jayud Global Logistics Ltd. shares saw a record 96% plunge on April 2. China Liberal Education Holdings Ltd. shares shed 98% in one day in January, and then in June, the stock was suspended from trading by Nasdaq, which also denied a company request to continue its listing.

55. Several of these manipulations led to investigations, regulatory proceedings, and even indictments. A particularly newsworthy example was the China Liberal Education Holdings, Ltd. case, where federal prosecutors in Chicago indicted seven individuals and seized approximately $214 million in March of 2025.[13] [14]

56. Then on August 18, 2025 – just eleven days before PMI's IPO – the Financial Times ran a story on the phenomenon as well, entitled: *"I almost fell off my chair": Investors lose billions on meme stocks as "pump and dump" scams multiply*, with the subtitle: *A handful of Nasdaq-listed Chinese companies crashed last month after heavy promotion on social media*.[15]

---

[13] *Federal Law Enforcement in Chicago Seizes $214 Million in Alleged "Pump and Dump" Investment Fraud Investigation; Seven Defendants Indicted*, U.S. Attorney's Office, Northern District of Illinois, March 21, 2025, https://www.justice.gov/usao-ndil/pr/federal-law-enforcement-chicago-seizes-214-million-alleged-pump-and-dump-investment.

[14] Relatedly, in connection with the CLEU ramp-and-dump, a plaintiff filed a class action complaint against Meta on June 20, 2025, asserting state law claims for Meta's role in facilitating the unlawful advertisements on Facebook and Instagram funneling users into WhatsApp groups where fake investment advisors pumped the price of CLEU prior to its collapse. *Bouck v. Meta Platforms, Inc.*, 25-cv-05194 (N.D. Cal). The court denied Meta's motion to dismiss in part, allowing some claims to proceed, but later dismissed for lack of jurisdiction due to SLUSA's prohibition against bringing class actions based on the purchase or sale of nationally traded securities under state law. *See id.* at Dkt Nos. 61, 83.

[15] George Steer, *"I almost fell off my chair": Investors lose billions on meme stocks as "pump and dump" scams multiply*, Financial Times, August 18, 2025, https://www.ft.com/content/38c9815b-8ccc-40d5-bcbf-cfdb8b73ffa6?syn-25a6b1a6=1.

57. The Financial Times article began:

> Investors lost billions of dollars in July betting on a handful of small US-listed Chinese stocks that plunged in value shortly after being heavily promoted on social media.
>
> Seven Nasdaq-listed microcap stocks — Concorde International, Ostin Technology, Top KingWin, Skyline Builders, Everbright Digital, Park Ha Biological Technology and Pheton Holdings — all dropped more than 80 per cent over a few trading sessions in recent weeks.
>
> The declines wiped a cumulative $3.7bn off their market value, according to price data analysed by predictive analytics firm InvestorLink. All seven stocks had surged before their sudden sell-offs, having been plugged to investors on WhatsApp groups and social media sites.

58. The article noted that: "Many scams are linked to the record number of Chinese companies that went public on US stock exchanges in 2024, a trend that has continued this year with China and Hong Kong-based companies dominating the otherwise sleepy US microcap IPO market."

59. Finally, the article pointed out the sheer repetition of this ramp-and-dump manipulation, writing:

> Analysts say US regulators have been repeatedly warned that certain stocks are being used as vehicles for fraud.
>
> Almost every week for the past seven months, InvestorLink's founder Matthew Michel has emailed contacts, including the FT, to flag unusual social media activity around certain US-listed microcap stocks.
>
> One large Wall Street trading firm — which also utilises InvestorLink's platform and asked not to be named — has repeatedly warned the Securities and Exchange Commission and Nasdaq of the potential manipulation of shares in certain companies.

60. Shortly after this article appeared in the Financial Times, its author, George Steer, appeared on the FT News Briefing podcast to discuss further.[16]

[16] Marc Filippino, Nikou Asgari and George Steer, Transcript: *The return of "pump and dump" stock scams*, FT News Briefing, August 22, 2025, https://www.ft.com/content/c29bc91f-d206-46a9-95d8-62497ece3cbb?syn-25a6b1a6=1.

61. On the August 22, 2025 podcast, now just a week before PMI's IPO, Steer reflected on the ramp-and-dump trend: "So these seven stocks are just the tip of the iceberg, really. All of them are listed on Nasdaq. All of them have their main operations in China, and all of them surged by hundreds, sometimes thousands, of per cent in the weeks leading up to very sudden sell-offs in July, wiping more than $3.7 billion off their combined market value, which kind of backs up what the FBI said in a notice last month. They said that they'd seen a 300 per cent increase year on year in victim complaints referencing pump and dump stock fraud."[17]

62. This chronology demonstrates that, leading up to the PMI IPO, there was a specific and recurring manipulation pattern affecting low-priced, low-float, newly public small-cap issuers. The pattern involved highly concentrated share supply, limited public float, social-media and messaging-app promotion, impersonated financial professionals, manipulative price inflation and subsequent dumping of shares, causing catastrophic losses for investors. PMI's offering had many of the core structural features the regulators had flagged: it raised only $17 million, sold only 4.25 million shares, priced at $4.00 per share, had no prior public market, had operations based in China, and created a public IPO float of only approximately 5.9% of outstanding shares. Accordingly, PMI's generic warnings about volatility and the absence of a prior market were inadequate because they did not disclose the specific, known risk that PMI's stock could be manipulated through a ramp-and-dump scheme unrelated to the Company's fundamentals. This risk was not merely theoretical; it was a known trend that was required to be, but was not, disclosed under the federal securities laws.

---

[17] At the end of the podcast, Steer was asked whether anything can be done, and by whom, to stem this flow of ramp-and-dump schemes aimed at small-cap IPOs. Steer's response expressed a sense of exasperation as to how this identifiable trend can be allowed to persist and injure investors over and over again. He commented: "Well, we spoke with Meta, who said that they are doing everything they can to remove the adverts that people click on. But I guess the body that is ultimately responsible for ensuring investor safety in the US is the Securities and Exchange Commission. We went to them for comment, and they provided no comment. Nasdaq, the kind of tech-heavy stock exchange where all of these stocks are listed, provided no comment. Perhaps one of the reasons why a lot of the regulatory bodies were reluctant to say anything is because these pump and dumps often involve very small stocks and retail investors. The losses on their own are very small. Cumulatively, they're large, but it's an easy problem to ignore. I mean, most big investors are not looking at micro caps, at the Chinese penny stocks that we mentioned in the story. They're looking at the Nvidias of this world, Meta, Alphabet and so on."

**B. Picard Medical's Misleading Registration Statement**

63. On August 6, 2025, after a series of amendments, Picard Medical filed its final amended registration statement with the SEC on Form S-1/A. The SEC declared the registration statement effective on August 12, 2025. On August 28, 2025, Picard Medical announced the pricing of its initial public offering, and the next day, on August 29, 2025, Picard Medical common stock began trading on the NYSE American under the ticker symbol "PMI." Picard Medical's final prospectus for the IPO was filed pursuant to Rule 424(b)(4) on August 29, 2025, and forms part of the registration statement. The IPO formally closed on September 2, 2025.[18]

64. In the IPO, Picard Medical sold 4,250,000 shares of its common stock at $4.00 per share, for gross proceeds of $17.0 million and estimated net proceeds of approximately $15.4 million after deducting underwriting fees and discounts.

65. The Registration Statement was negligently prepared and failed to disclose that: (a) at the time of the IPO, there was a known and material risk that low-priced, low-float small-cap IPOs could be targeted in ramp-and-dump schemes involving social-media promotion, messaging-app investment groups, impersonated financial professionals, concentrated or nominee-controlled share allocations, and artificial price inflation followed by coordinated dumping; (b) PMI's IPO exemplified many of the core features regulators had identified as making these schemes more likely, including its $4.00 offering price, $17 million offering size, just 4,250,000 shares sold to the public, no prior public market, concentrated post-IPO ownership, key operations and affiliates in China, and an IPO public float representing only approximately 5.9% of outstanding shares; and (c) these conditions made PMI's common stock materially more susceptible to manipulation and collapse than the Registration Statement's generic volatility and liquidity warnings disclosed.

66. Instead of disclosing the known, particularized and material risk of ramp-and-dump manipulation, the Registration Statement simply warned in generic and anodyne terms:

***An active trading market may not develop or be sustained.***

[18] In an IPO, the issuer's shares typically begin trading the day after the SEC declares its registration statement effective. An IPO typically closes the second business day after the start of trading, after the filing of the final prospectus.

> The market for our securities may be highly volatile or may decline regardless of our operating performance. An active public market for our securities may not develop or be sustained after the closing of the Initial Public Offering. We cannot predict the extent to which investor interest in us will lead to the development of an active trading market in common stock or how liquid that market might become…

67. This was misleading because it addresses illiquidity and volatility in general terms, but not the specific, known market-structure risk that the low price-point, concentrated holdings and thin public float put the offering at risk of artificial price movement through social-media/messaging-app ramp-and-dump activity leading to a spike and crash, as had happened with so many structurally similar stock offerings in the recent past. In the face of this known risk, PMI's disclosure was generic, inadequate and materially misleading.

68. The Registration Statement also warned:

> ***Our common stock has no prior market and our stock price may decline after the offering.***
>
> Prior to this offering, no public market has existed for our common stock. Although we have been approved to have our common stock listed on NYSE American, an active trading market for our common stock may not develop or, if it develops, may not be sustained after this offering. We and the underwriters will negotiate to determine the initial public offering price. The initial public offering price may be higher than the market price of our common stock after the offering and you may not be able to sell your shares of our common stock at or above the price you paid in the offering. As a result, you could lose all or part of your investment.

69. This was misleading because it warns that a market may not develop or the stock may trade below $4.00, in general terms, but does not disclose that the market that did develop could be artificially manufactured through coordinated promotion and trading because the fact that only 5.9% of shares were offered to IPO investors made the offering structurally similar to the many examples of small cap post-IPO ramp-and-dump manipulations that have led to catastrophic investor losses in the recent past. In the face of this known risk, PMI's disclosure was generic, inadequate and materially misleading.

70. Next, the Registration Statement warned:

> Future sales of common stock, or the perception that future sales may occur, may cause the market price of common stock to decline, regardless of our operating performance.

71. This was misleading because it appears to warn that lawful future sales could depress the price of PMI securities, but does not warn that the offering's very small float created the ideal conditions for concentrated holders, nominees, allocation recipients, or affiliates to dump shares into artificially induced retail demand after coordinated online promotion, just as what happened to so many small cap, China-linked IPOs that had fallen prey to ramp-and-dump schemes in the recent past. In the face of this known risk, PMI's disclosure was generic, inadequate and materially misleading.

72. In sum, even though regulators had repeatedly warned before the IPO that low-priced, low-float, newly public small-cap issuers were particularly vulnerable to coordinated schemes in which bad actors used social media, messaging-app investment groups, impersonated financial professionals, artificial trading activity, and concentrated or nominee-controlled share positions to ramp up the apparent market price and demand for the stock, the Registration Statement did not disclose or warn that PMI's shares were susceptible to market manipulation, pump-and-dump or ramp-and-dump schemes, social-media or messaging-app promotion, artificial trading activity or dumping into pumped-up retail demand.

73. Instead, it warned only generically that PMI had no prior public market, that an active trading market might not develop or be sustained, that the market price could be volatile or decline regardless of operating performance, and that future sales could depress the trading price. These generic warnings failed to disclose the specific material risks that made PMI and its low-cost, low-float structure extremely vulnerable to the known ramp-and-dump playbook that had triggered artificial scarcity, price inflation, and then devastating collapse over and over. Unfortunately for PMI's investors, it would soon happen again.

### C. Statutory Framework Applicable to the Registration Statement: Item 105 and Item 303

74. Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 mandates, in the "Risk Factors" section of the Registration Statement, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky," and requires PMI to tailor those risk factors to the Company and the offering.

75. The Registration Statement failed to do so. Instead, while PMI disclosed generic risks concerning volatility, the absence of a prior public market and the possibility that an active trading market might not develop or be sustained, it failed to disclose the specific and material risk that PMI's low-priced, low-float IPO structure made its common stock susceptible to the ramp-and-dump manipulation that had afflicted numerous similar companies and elicited repeated warnings from regulators seeking to protect investors from exactly this risk.

76. The risk was not merely that PMI's shares might fluctuate for ordinary market reasons. The omitted risk was that the market for PMI shares could be artificially manufactured and then collapse when that manipulation ended. Because PMI's IPO exhibited the precise risk factors that made PMI especially vulnerable – only about 5.9% of PMI's shares were sold into the public market and as a result even modest coordinated buying could create the appearance of genuine demand, liquidity, and price momentum – the Registration Statement's generic warnings were material, misleading and inadequate.

77. By omitting this known, offering-specific risk, the Registration Statement failed to disclose a material factor that made an investment in PMI risky, violating Item 105.

78. In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303, requires disclosure of any known events, uncertainties or trends reasonably likely to have a material effect on the Company's financial condition, liquidity, capital resources, revenues, or future operating results.

79. The Registration Statement failed to do so. At the time of the IPO, there was a known and material trend affecting low-priced, low-float small-cap IPOs and newly public issuers similar to PMI: these issuers were being targeted in ramp-and-dump schemes that used social media, messaging-app investment groups, impersonated financial professionals, artificial trading activity, nominee or concentrated share positions, and coordinated dumping into pumped-up retail demand, often triggering a massive crash. Before PMI's IPO, regulators, exchanges, law enforcement, and market participants had warned that small-cap IPOs with limited public floats, small offering sizes, low offering prices, concentrated ownership or allocations, and no established public market, often with key subsidiaries located in China, were particularly susceptible to these schemes.

80. The Registration Statement did not disclose this known trend or uncertainty. Instead, PMI provided only generic warnings that no prior public market existed, that an active trading market might not develop or be sustained, that the stock price could be volatile or decline regardless of operating performance and that future sales of common stock could depress the trading price. These generic warnings did not disclose the specific known trend that low-priced, low-float small-cap IPOs were being targeted for ramp-and-dump manipulation, nor did they explain that PMI's IPO structure placed the Company at the heart of that risk profile, and only provided the sort of generic and boilerplate disclaimer that the SEC has specifically deemed inadequate. *See Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers,* 1998 WL 425894, at *14 (July 29, 1998).

81. Moreover, PMI expressly stated that one purpose of the IPO was to create a public market for its common stock and facilitate future access to public equity markets. The known ramp-and-dump trend, however, threatened the very public-market access and trading-market stability that PMI claimed the IPO would provide. If PMI's stock were artificially inflated through online promotion and then collapsed after coordinated dumping of shares, PMI's ability to use the public market to finance operations, raise future equity capital, attract investors, maintain market credibility, and support ongoing liquidity would be materially impaired.

82. Because the Registration Statement failed to discuss this known trend, it was materially false and misleading, and violated Item 303.

**D. Post-IPO Developments**

83. PMI's common stock began trading on the NYSE American on August 29, 2025, at an IPO price of $4.00 per share.

84. Almost immediately, the market for PMI shares developed in precisely the manner the Registration Statement failed to warn investors about. Because PMI's IPO created a public float of only 4.25 million shares, representing approximately 5.9% of shares outstanding, modest coordinated buying and promotional activity could – and did – create the appearance of genuine liquidity, demand, and price momentum. The structure of Picard Medical's IPO and low float made the scam possible.

85. In the weeks following the IPO, PMI's stock price rose sharply, untethered to any corresponding developments at the Company. The rapid post-IPO run-up was not the product of ordinary market demand; rather, PMI's shares were artificially inflated through a fraudulent stock-promotion campaign involving social-media-based misinformation, messaging-app promotion, and impersonated financial professionals.

86. On September 30, 2025, Edwin Dorsey, the financial researcher whose report had been discussed by Bloomberg back in July, published the following tweet:[19]

[19] Edwin Dorsey (@StockJabber), X (Sep. 30. 2025 at 1:52 PM), https://x.com/StockJabber/status/1973083494550229500.

Post

**Edwin Dorsey**
@StockJabber

I'm glad @SECGov is taking action against manipulated U.S.-listed China stocks by suspending trading in $SDM and $QMMM. Here are some other stocks being promoted by overseas stock manipulators according to StopNasdaqChinaFraud.com:

Happy City Holdings $HCHL
Picard Medical $PMI
Nusatrip $NUTR
Empro Group $EMPG
Pitanium $PTNM
Lixiang Education $LXEH
Kandal M Venture $FMFC
Mint Incorporation $MIMI
Epsium Enterprise $EPSM
Uni-Fuels Holdings $UFG
Etoiles Capital Group $EFTY
Solowin Holdings $SWIN
Linkhome Holdings $LHAI
Reitar Logtech Holdings $RITR
Premium Catering Holdings $PC




From stopnasdaqchinafraud.com

1:52 PM · Sep 30, 2025 · **103.7K** Views

87. Dorsey's tweet provided a link to his website, www.StopNasdaqChinaFraud.com, which warned: "Overseas stock manipulators are using WhatsApp groups to pump and dump U.S.-listed Chinese stocks, wiping out billions in investor savings."

88. The website collected screenshots of this ramp-and-dump manipulation scheme in action, in which impersonators, using stolen identities of legitimate financial advisors, touted Picard Medical in online forums, chat groups, and through social media posts with sensational but baseless claims to create a buying frenzy among retail investors:[20]




[20] Edwin Dorsey, *www.StopNasdaqChinaFraud.com*.

7:40

91

<16

**James Hyerczyk**

Last seen 1 min ago



James.Advanced Member Stock Group 在 Viber 上

invite.viber.com

6:10 AM

Today

This week's stock ticker is: [PMI] Picard Medical.
The reason for this selection is that, based on the latest shared database from JPMorgan Chase and Goldman Sachs, our club has determined that PMI is about to receive significant positive news.
Please place a limit buy order at $7.40. If the price falls below $7.40, you can buy at the current price.
The target profit is expected to be 10-30%. After successfully placing a limit buy order or making a successful purchase, please take a screenshot to confirm. I will send you a detailed target price and action plan. The holding period is 1-3 trading days.

7:35 AM


19:54
82
+1 (302) 237-3445
Good morning! We will be releasing our trading strategy for this month's #2 target from 10:00–11:00 ET. Watch for my messages during trading. 🌹🌹🌹🌹
16:39
Stock Code: PMI
Buy-in Price: $9.09
Core Strategy: Limit order buy-in
Holding Period: 3–5 days
Target Profit: 15%–20%
Profit-Taking Strategy: Exit the position once the target price is reached, following the strategy notification.
Execution Strategy:
To ensure that every member executes accurately, please submit a screenshot of your successful limit order and trade
I
The
I'm
Q W E R T Y U I O P
A S D F G H J K L
Z X C V B N M
123
space
return

WP-Stock Investors Club -52
Announcements

stocks is bound to experience a correction. Mid- to late November will be the best time to buy again. 15:37

~ Richard Bennett +1 (438) 619-0607
Community admin

Avoid excessive short-term trading. Most stocks have recently entered a period of correction, and excessive trading at this time can lead to buying at high prices and resulting in losses.

For now, we will patiently trade dark horse stocks. WPG and JPMorgan Chase will jointly guarantee profits from all dark horse stocks, so dark horse stocks are our current preferred trading targets. 15:42

~ Richard Bennett +1 (438) 619-0607
Community admin




❇️Stock Status❇️

🚀[Dark Horse Stock No. 1] is currently trading slightly lower. Even in a market downturn, it remains stable. Our overall profit is currently around 6%. I plan to sell at a profit tomorrow morning. I will privately notify all investors trading [Dark Horse Stock No. 1] at that time. Please hold on patiently and wait for my take-profit notification! 15:46


19:39
32
2
Stock Business School
~..., ~Coleman Oneil, ~Isabella, ~Kordell Riley,...
19:05
~Isabella +1 (302) 237-3445
~Morrison Hannah +1 (334) 370-3438
When should we sell PMI stock? Will the professor notify the group?
🌹🌹🌹🌹🌹 All future transactions should continue to follow the established process:
Prior to executing any trade, please send a private message to me or the professor to schedule an appointment.
After the order is filled, you must submit the transaction record, including:
• Purchase price
• Position size
• (Preferably attached) Screenshot of the position
This information will be used for our dual registration and data verification, enabling more efficient and precise management of subsequent position-building, position-reduction, and closing orders. This approach maximizes profits and minimizes risks.
19:08
4
~Mijal Tesfu +1 (226) 878-5112
You'll get notifications only for @mentions, replies, messages from contacts and more for larger groups. Change in group settings.
Receive all
OK
You can't send messages to this group because you're no longer a member.


1:30
5G 71
50
+1 (401) 219-4532
Thank you 🙏
9:32 AM
Since your current position size is relatively small, I recommend increasing it to 4000 or even 5000 shares. This will allow you to fully capitalize on the upcoming breakout move and significantly maximize your profit potential
10:14 AM
Sounds good
So just buy at market price or wait for it to dip?
10:28 AM
Please let me know how much additional capital you plan to add, and I will provide you with the optimal entry price
10:52 AM
Maybe another 500 to 1000 shares
10:59 AM
Please place your buy order for PMI at $12.84 Once your order is filled, kindly send me a screenshot so I can register it and include you in the profit monitoring process
11:00 AM
After you complete the PMI order, please send me a screenshot of your trade so I can track it for you
1:38 PM

89. By October 23, 2025, PMI's stock price had surged to an all-time high of approximately $13.68 per share, more than three times the $4.00 IPO price, despite there being no Company-specific news to drive the increase.

90. On that day, Dorsey tweeted: "$PMI is being manipulated by overseas stock manipulation groups and looks close to the end stage of the pump-and-dump. Caveat emptor." To that tweet, Dorsey attached several of the screenshots evidencing communications that were part of the ramp-and-dump promotion scheme, as well as a photo of PMI's stock chart showing that the stock had gained nearly 30% over the past five days.[21]

91. The artificial inflation began to collapse on October 24, 2025. After closing at approximately $13.20 per share on October 23, 2025, PMI's stock price plunged by about 70% in one day.

92. After staying silent throughout the ramp-and-dump manipulation, the Company released a press release on October 24, 2025, in response to the 70% drop in share price, stating that the Company "is not aware of any undisclosed material change in the Company's operations or financial condition, that would account for the recent volatility in its stock price."

93. The collapse continued unabated, with PMI's stock price plunging to about $2.00 at the time investors brought an action under Section 10(b) of the Securities Exchange Act, and falling further to just 10 cents at the time of this operative complaint bringing claims under Section 11 and Section 12 of the Securities Act.

**E. The Underwriter Defendants Violated the Securities Act**

94. Section 11 of the Securities Act provides that underwriters are liable for any false statements of material facts or the omission to state a material fact in a registration statement. 15 U.S.C. § 77k(a)(5).

95. The final prospectus indicated that Picard Medical engaged each of the Underwriter Defendants to conduct the IPO.

[21] Edwin Dorsey (@StockJabber), X (Oct. 23, 2025 at 4:34 PM), https://x.com/StockJabber/status/1981504546846228870.

96. Section 11 provides that underwriters are liable for damages resulting from materially false misstatements and omissions contained in the Registration Statement.

97. It is commonly understood in the underwriting industry that the underwriter "prepare[s] disclosure and conduct[s] marketing" of the prospectus and registration statement. Goldman Sachs, *Report of the Business Standards Committee, January 2011*, at 13. Underwriters "assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id*.

98. As gatekeepers, underwriters must independently verify all material facts in offering documents such as the Registration Statement. To conduct a proper due diligence, underwriters must take an *adverse* role to the issuer during the diligence process. Accordingly, underwriters are required to play "devil's advocate" to the issuer to ensure that the offering documents are accurate and complete such that no material information is omitted that is needed to make the information provided therein not misleading.

99. In recognizing the importance of a reasonable due diligence investigation, the SEC has observed that, in enacting Section 11 of the Securities Act, "Congress recognized that underwriters occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their *careful investigation* of the offering." Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998. In other words, underwriters, such as the Underwriters here, have ultimate control over the contents and dissemination of the disclosure document, *i.e.* the Registration Statement. Underwriters must make full disclosure or not underwrite the offering if full disclosure is not provided. The Underwriters had this role and duty in underwriting Picard Medical's IPO.

100. The Underwriter Defendants failed to conduct a reasonable due diligence investigation with regard to Picard Medical's IPO. In particular, the Underwriter Defendants, had they performed adequate due diligence, would have been aware of the trend of ramp-and-dump manipulation affecting low-priced, low-float, small-cap IPOs that share so many structural

similarities with the IPO here, would have been aware that Picard Medical's IPO was especially vulnerable and provided an appropriate warning in the Registration Statement. They did not.

## V. CLASS ACTION ALLEGATIONS

101. Plaintiffs bring this action on behalf of a class consisting of all persons and entities who purchased the common stock of Picard Medical in the Company's IPO, which closed on September 2, 2025, or purchased Picard Medical common stock pursuant and/or traceable to the Company's Registration Statement issued in connection therewith.[22]

102. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Picard Medical or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

103. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

104. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

105. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the Securities Act;

[22] Excluded are (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of Picard Medical; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

(b) whether the Registration Statement contained false or misleading statements of material fact or omitted material information required to be stated therein; and

(c) to what extend members of the Class have sustained damages and the proper measure of such damages.

106. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI. CAUSES OF ACTION

### <u>COUNT I</u>

### <u>Violations of Section 11 of the Securities Act Against All Defendants</u>

107. Plaintiffs incorporate all the foregoing allegations by reference.

108. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants

109. The Registration Statement contained materially misleading statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

110. None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and complete and without omissions of any material facts and were not misleading.

111. By reason of the conduct herein alleged, all Defendants named in this Count violated §11 of the Securities Act.

112. At the time of their purchases of Picard Medical securities, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and did not know the Registration Statement was inadequate and defective.

113. This claim is brought within one year after discovery of the misleading statements and/or culpable omissions in the Registration Statement, and within three years of the IPO. It is therefore timely.

**COUNT II**

**Violations of Section 15 of the Securities Act Against the Individual Defendants**

114. Plaintiffs incorporate all the foregoing by reference.

115. This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants.

116. The Individual Defendants were controlling persons of Picard Medical by virtue of their positions as directors and/or officers of Picard Medical, and by their ownership of controlling shares of the Company. The Individual Defendants each had a series of direct and indirect business and personal relationships with the other directors and/or officers and major shareholders of the Company.

117. The Individual Defendants were culpable participants in the violations of §11 of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement, their consent to being named in the Registration Statement, and having otherwise participated in the process which allowed the IPO to be successfully completed.

118. This claim is brought within one year after discovery of the misleading statements and/or culpable omissions in the Registration Statement, and within three years of the IPO. It is therefore timely.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives;

(b) Awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## VIII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 28, 2026

**THE ROSEN LAW FIRM, P.A.**

*/s/ Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Tel.: 213 785 2610
lrosen@rosenlegal.com

Michael Cohen (*pro hac vice* forthcoming)
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel.: 212 686 1060
mcohen@rosenlegal.com

*Counsel for Lead Plaintiffs and the Class*